UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

_____

|  |  |
|---|---|
| NATIONAL RAILROAD PASSENGER CORPORATION, | ) ) ) |
|  | ) |
| Plaintiff, | ) |
|  | ) |
| v. | ) Civil Action No. 02-1773 (RBW) |
|  | ) |
| EXPRESSTRAK, L.L.C., | ) |
|  | ) |
| Defendant. | ) |

_____ )

## MEMORANDUM OPINION

The plaintiff brings this action alleging that the defendant breached certain lease agreements for railcars it acquired from the plaintiff by failing to make the required lease and interest payments for the cars pursuant to the agreements. Second Amended Complaint ("Compl.")  ¶¶ 1; 42-43.  Specifically the plaintiff alleges in its Second Amended Complaint a breach of contract claim (Count I) and a restitution/unjust enrichment claim (Count II).  Id. at ¶¶ 41-49. The plaintiff has now filed a motion for partial summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure as to Count I of the Second Amended Complaint alleging that the defendant breached the terms and conditions of the Sublease of Railroad Equipment (Amtrak Sublease No. 01-AS) ("Sublease") entered into by

the parties.[1] Plaintiff's Motion For Partial Summary Judgment.[2]   For the reasons set forth below, the Court grants the plaintiff's motion for partial summary judgment as to its claim for the defendant's breach of the Sublease.

## I.  Factual Background

The plaintiff in this action is the National Railroad Passenger Corporation ("Amtrak") and the defendant is ExpressTrak, L.L.C. ("ExpressTrak"). ExpressTrak, Inc., predecessor of ExpressTrak, was established in 1996 by R. Franklin Unger ("Unger") and Robert Walker (" Walker") for the purpose of transporting food and other perishable goods across the country in temperature-controlled railroad cars.  Exhibits submitted with Plaintiff's Memorandum of Law In Support of Plaintiff's Motion for Partial Summary Judgment ("Amtrak Ex.") 1

---

[1] The plaintiff's breach of contract claim (Count I) concerns three related contracts that set forth the terms of the commercial venture between the parties.  The three contracts are the Sublease, the Letter Agreement, and the Operating Agreement.  The Sublease is the subject of the present motion.  However, the plaintiff has filed a separate pending motion for partial summary judgment as to Count I alleging that the defendant breached the terms and conditions of the Letter Agreement dated November 30, 2001 and the Operating Agreement, dated October 27, 1999.  In addition, in the pleadings, the parties interchangeably use the terms Letter Agreement and Direct Lease in referring to the same document.  For clarity, we will refer to the actual executed agreement dated November 30, 2001 as the Letter Agreement and the anticipated more formal agreement that was never actually finalized as the Direct Lease.

[2] Also filed in connection with this motion are the Plaintiff's Memorandum of Law in Support of Plaintiff's Motion for Partial Summary ("Pl.'s Mem."), Defendant ExpressTrak L.L.C.'s Statement of Genuine Issues in Opposition to Plaintiff's Motion for Partial Summary Judgment, Opposition of Defendant ExpressTrak L.L.C. to Plaintiff's Motion for Partial Summary Judgment ("Def.'s Opp'n. Mem."), and Plaintiff's Reply Memorandum of Law in Further Support of its Motion for Partial Summary Judgment ("Pl.'s Reply").

(ExpressTrak Business Plan dated Feb. 21, 2000).  To accomplish this objective,

ExpressTrak eventually entered into a joint venture with Amtrak, pursuant to

which ExpressTrak would have its express railcars attached to high speed Amtrak

passenger trains to shorten the time of transcontinental rail delivery of its

perishable commodities.  Amtrak Ex. 3 (chronology of Events: ExpressTrak-

Amtrak Negotiations).  ExpressTrak[3], in it reincarnation, formally commenced

operations in April 1998 and thereafter entered into a "roadrailer" agreement with

Amtrak.[4] Amtrak Ex. 7 (letter of Agreement-Roadrailer Units dated Apr. 6, 1998);

Amtrak Ex. 8 (letter from Unger to Gagen dated Apr. 21, 1999).

On January 8, 1999, Amtrak, ExpressTrak, and Soave Enterprises executed a

Memorandum of Understanding setting forth "the essential elements of an 8-car

prototype demonstration that the parties hope[d] [would] lead to the joint

operation of a substantial refrigerated express service," whereby Amtrak would

initially lease from The CIT Group ("CIT") and refurbish 8 cars at a cost of

---

[3] ExpressTrak was formed after "Anthony Soave, owner of Soave Enterprises [("Soave")], agreed to receive forty-nine percent equity in [ExpressTrak, Inc. in return for] fund[ing] [the company's] start-up expenses...."  Amtrak Ex. 8 (letter from Unger to Don Gagen dated April 21, 1999). Unger and Walker then became minority shareholders in the venture. Id. Soave also changed the organizational form of ExpressTrak, Inc. from a corporation to a limited liability company, which was renamed ExpressTrak. Id.

[4] A "roadrailer" is a special freight vehicle that is similar to a semi-truck trailer but that can travel on both highways and railroad tracks.  Pl.'s Mem. at 3-4.  Roadrailers are typically used in intermodal railroad service and can be pulled directly behind other freight equipment without the use of trailer flatcars. Id.

approximately $1.5 million that it would use to transport ExpressTrak's products. Amtrak Ex. 11 (Memorandum of Understanding dated Jan. 8, 1999) at AM 0009668-0009669.  The Memorandum of Understanding also outlined the basic contours of the contemplated expanded business between the parties if (1) the prototype demonstration was successful and (2) Amtrak decided to acquire additional refrigerated express cars.  See id. at AM 0009675.  Amtrak solicited bids for the refurbishing work for the prototype program and acquired a right of first refusal from CIT on 225 refrigerated railcars that could be used for expanded service if the prototype program was successful.  Amtrak Ex. 12 (letter from Victoria McManus to Carol Dillon dated Mar. 22, 1999).

The bidding process for refurbishing the prototype cars for the expanded service was unsuccessful.  Amtrak Ex. 16 (letter from Arlene Friner to Walker and Unger dated July 23, 1999).  As a result, in July 1999, Amtrak advised ExpressTrak that "[t]wice Amtrak has solicited proposals, at considerable expense and effort,"  but that the "first proposal resulted in only one bid that was materially non-responsive in numerous respects" and "there were no responses to the second proposal."Id.  Consequently, Amtrak advised ExpressTrak that it was "not feasible" to proceed with the prototype program by acquiring and refurbishing the eight prototype cars and then with the expanded service in accordance with the

terms contemplated by the parties in the Memorandum of Understanding.  Id.

Consequently,  ExpressTrak acquired the responsibility of either building or refurbishing the prototype railcars.  Amtrak Ex. 16 (letter from Arlene Friner to Walker and Unger dated July 23, 1999).  Morever, Amtrak advised ExpressTrak that if the parties proceeded with the expanded program beyond the prototype stage, Amtrak would not be willing to acquire or lease the additional railcars.  Id. However, Amtrak expressed its interest in continuing the relationship with ExpressTrak.  Id.  As a result of further negotiations, Amtrak agreed to "explore the feasibility of [entering into] an alternative arrangement in which [it] [would] finance the equipment but the risks associated with ownership and operation [would] [be] transferred to [ExpressTrak] or third parties." Exhibits to Defendant's Opposition to Plaintiff's Motion for Partial Summary Judgment ("ExpressTrak Ex.") 6 (letter from Unger to Friner dated Sept. 21, 1999); Amtrak Ex. 19 (letter from Friner to Unger dated Oct. 1, 1999).  Thus, the parties abandoned the Memorandum of Understanding and executed the Agreement Between Amtrak and ExpressTrak for Temperature Controlled Perishables Express Transportation ("Operating Agreement") on October 27, 1999, which called for Amtrak to provide for the same intercity transportation services for ExpressTrak.  Amtrak Ex. 20, ExpressTrak Ex. 7 (Operating Agreement).

The Operating Agreement required ExpressTrak to acquire the railcars and enter into a contract with a vendor to have the cars refurbished in accordance with Amtrak's specifications. Id. §§ 1.1,1.2.  Pursuant to the Operating Agreement, the parties contemplated that ExpressTrak would cause the refurbished cars to be conveyed to a third-party lessor, who would thereafter own and retain title to the cars. Id. § 1.8.  The third-party lessor would in turn lease the cars to Amtrak, and Amtrak would then sublease the cars to ExpressTrak. Id.  Under this arrangement, Amtrak would make the lease payments to the third-party lessor, and ExpressTrak would simultaneously make equivalent lease payments to Amtrak. Id.

After the execution of the Operating Agreement, Amtrak issued an offering memorandum to over 30 sophisticated institutional investors, including GE Capital, Banc One, Boeing Capital, and Orix USA Corporation ("Orix"), seeking bids to finance the project. Amtrak Ex. 22 (letter from Carol Dillon to Unger dated July 10, 2000); 23 (facsimile from Sue Sparks to Raj Srinath dated June 12, 2000); ExpressTrak Ex. 19 (letter from Dillon to Unger dated July 10, 2000).  Amtrak initially awarded the bid for the entire fleet to Boeing Capital.  Amtrak Ex. 22 (letter from Dillon to Unger dated July 10, 2000).  When negotiations with Boeing Capital stalled in the fall of 2000, Amtrak secured an alternative financing commitment from Orix to refurbish approximately 110 refrigerated railcars for the

expanded fleet at a cost not to exceed $13.86 million.   Amtrak Ex. 24 (letter from

Dillon to Unger dated Oct. 19, 2000); ExpressTrak Ex. 23 (Proposal for Rebuilt

Refer Boxcars dated Sept. 13, 2000).  Subsequently, Amtrak secured commitment

letters from Boeing Capital to finance the remaining refrigerated railcars

(approximately 250 cars) for the expanded fleet.  Amtrak Ex. 25 (Boeing

Commitment Letter dated Mar. 30, 2001); ExpressTrak Ex. 29 (letter from Boeing

Capital to Sparks dated Nov. 20, 2000).

   On November 9, 2001, the Amtrak Reform Council[5] issued its finding that

Amtrak would fail to achieve operational self-sufficiency by December 2, 2002, as

required by Congress.[6]  ExpressTrak Ex. 40 (letter from Orix to Amtrak dated

---

   [5] The Amtrak Reform Council is an independent bipartisan commission that was charged
by Congress with oversight of Amtrak's performance under the Amtrak Reform and
Accountability Act of 1997 including evaluating Amtrak's performance and making
recommendations to Amtrak for achieving further cost containment and productivity
improvements and financial reforms.  Amtrak Reform and Accountability Act of 1997, Pub. L.
No. 105-134, §203, 111 Stat. 2570, 2579-81.  The Amtrak Reform Council is also responsible for
providing Congress with yearly reports on Amtrak's progress on the resolution of productivity
issues or the status of those productivity issues and making recommendations for improvements
and for any changes in law it believes to be necessary or appropriate.  Id.  The goal of operational
self-sufficiency on Amtrak's part also was mandated in the same enactment: "Commencing no
later than the fiscal year following the fifth anniversary of [this Act], Amtrak shall operate
without Federal operating grant funds appropriated for its benefit."  Id. § 201, 111 Stat. 2578.

   [6] Amtrak was required to meet financial goals set forth in 49 U.S.C. §24101(d) (2000).
49 U.S.C. §24101(d) provides that:

          To carry out subsection (c)(11) of this section, Amtrak is
          encouraged to make arrangements with the private sector and
          undertake initiatives that are consistent with good business

(continued...)

Nov. 16, 2001).  Relying on that revelation, as well as other events, Orix, on

November 16, 2001, provided notice to Amtrak, ExpressTrak, and Ebenezer

Railcar Services ("Ebenezer")[7] that it was suspending its commitment to provide

financing for refurbishing any further cars.  Id.  As of that time, Orix had financed

55 cars (1prototype car previously owned by ExpressTrak and 54 cars refurbished

by Ebenezer).  Def.'s Opp'n. Mem. at 18.  An additional 55 cars remained to be

refurbished by Ebenezer under its contract with ExpressTrak.  Id.  ExpressTrak

therefore invoked the guarantee agreement of December 28, 2000, that had been

made by Amtrak.  ExpressTrak Ex. 33 (letter from Friner to Unger dated Dec. 28,

2000).  Under this agreement, Amtrak agreed to fund or obtain third-party

financing to refurbish the remaining 55 cars.  ExpressTrak Ex. 88 (letter from

Unger to Sargrad dated Nov. 21, 2001).  By a letter agreement of November 30,

2001 ("Letter Agreement"), Amtrak and ExpressTrak agreed to enter into a direct

lease of these remaining cars being refurbished by Ebenezer and, pending

---

[6](...continued)
> judgment and designed to maximize its revenues and minimize
> Government subsidies.  Amtrak shall prepare a financial plan to
> operate within the funding levels authorized by section 24104 of
> this chapter, including budgetary goals for fiscal years 1998
> through 2002.  Commencing no later than the fiscal year following
> the fifth anniversary of the Amtrak Reform and Accountability Act
> of 1997, Amtrak shall operate without Federal operating grant
> funds appropriated for its benefits.

[7] Ebenzer is the manufacturer ExpressTrak secured to refurbish the railcars.

execution of a more formal Direct Lease, to have the Letter Agreement itself serve

as the lease between the parties.  ExpressTrak Ex. 89 (letter from Dale Stein to

ExpressTrak dated Nov. 30, 2001).

**Orix's Headlease to Amtrak**

Consistent with the terms of the Operating Agreement between Amtrak and

ExpressTrak, on May 15, 2001, Amtrak entered into a Lease of Railroad

Equipment (Amtrak Lease No. 01-A) ("Headlease") with Orix. Pl.'s Mem. at 10;

Amtrak Ex. 31(Headlease).[8]  Amtrak was required under the Headlease to make

quarterly rent payments to Orix by wire on each January 1, April 1, July 1, and

October 1. Amtrak Ex. 31(Headlease) §§1.1, 4.1.  Such payments were required to

be made by Amtrak "by noon Washington, D.C. time on the date payment is due in

United States Dollars in immediately available funds."  Id. § 4.3.  Any payment

not made on the date payment was due was subject to mandatory interest penalties

that were required to be paid "without necessity of demand."  Id. § 4.2.

Amtrak's obligation to pay rent under the Headlease was explicitly recognized

to be "absolute and unconditional."  Id. § 5.2(I).  This absolute and unconditional

---

[8] The Headlease was the agreement that controlled the relationship between Orix as lessor and the Amtrak as lessee.  Amtrak Ex. 31 (Headlease)  The Headlease required Orix to purchase 1 railcar from ExpressTrak and the remaining  refurbished railcars directly from Ebenezer. Id. § 2.1.  Simultaneously, Orix was required to lease the railcars to Amtrak, and in turn, Amtrak was required to contemporaneously sublease the railcars to ExpressTrak pursuant to the terms of the Sublease between Amtrak and ExpressTrak.  Id.

obligation to pay rent on the specified due dates manifested itself in several different ways.  Pl.'s Mem. at 11.  First, Amtrak automatically defaulted on the Headlease if it failed to make any rent payments "within 5 days after the same shall become due."  Amtrak Ex. 31 (Headlease) § 13.1 (I).  This default event was triggered irrespective of whether "it was voluntary or involuntary," and the failure to pay rent on time was the only default event that the parties explicitly agreed to exempt from any right to cure.  Id.  §§ 13.1 (iv), 13.4.  Once a default event occurred, Orix "in its sole discretion," had the contractual right to "cancel or terminate" the Headlease "by notice in writing" so long as Amtrak had not remedied the breach prior to receipt of such notice.  Id. § 13.2 (ii).  At that point, Amtrak's rights of possession and use in the railcars "absolutely cease[d] and terminate[d] as though [the Headlease] had never been made," and Orix could demand return of all such railcars at Amtrak's expense.  Id.

Second, Amtrak agreed to waive any potential defenses if it should fail to honor the strict payment obligations.  Pl.'s Mem. at 11.  Specifically, the Headlease states that Amtrak was not entitled "to any abatement, deferral or suspension of Rent, reduction thereof or setoff against Rent, including abatements, reductions, deferrals, suspensions or setoffs due, or alleged to be due, by reason of any past, present or future claims" against Orix "either under this Lease or

otherwise." Id. §5.2(I).  Similarly, Amtrak agreed to waive "any and all existing

or future claims to any offset against the rent payments due hereunder, and

agre[ed] to make such payments regardless of any offset or claim which may be

asserted by [Amtrak] or on its behalf." Id. § 13.4.

Finally, the Headlease contained three explicit anti-waiver provisions that

governed Amtrak's payment obligations and prevented Amtrak from subsequently

attempting to alter its absolute and unconditional obligation to make timely

payments absent a written amendment signed by both parties. Id. §§ 13.3, 13.4,

21.2.  For instance, Section 21.2 states that no waiver of any Headlease

"provisions or conditions shall be valid unless in writing and signed by duly

authorized signatories" of Orix and Amtrak.

**Amtrak's Sublease to ExpressTrak**

On May 15, 2001, the same day the Headlease was signed, Amtrak, as lessor,

and ExpressTrak, as lessee entered into a Sublease for the cars financed by Orix

for Amtrak on ExpressTrak's behalf.  Pl.'s Mem. at 12. The Sublease required

ExpressTrak to make quarterly rent payments by wire transfer to Amtrak on the

same date Amtrak was obligated to make payments to Orix, in the same manner as

Amtrak made payment to Orix, and in the same amount as Amtrak's payments to

Orix.  Amtrak Ex. 32 (Sublease) §§ 1.1, 4.1, 4.3.  ExpressTrak's obligation to

make timely pay rent to Amtrak under the Sublease was similarly "absolute and unconditional." Id. at § 5.2 (I).

The Sublease also tracked the strict default and termination provision in the Headlease. Id. ExpressTrak therefore agreed that an automatic default of the Sublease occurred if it failed to make any rent payments "within 5 days after the same shall become due." Id. § 13.1(I). This default event was triggered irrespective of whether "it was voluntary or involuntary," and the parties specifically agreed that failure to pay rent on time would be the only default event that could not be cured. Id. §§ 13.1(iv), 13.4. Once a default event occurred, moreover, Amtrak had the contractual right to exercise "in its sole discretion" the option to "cancel or terminate" the Sublease by providing written notice so long as ExpressTrak had not remedied the breach prior to receipt of such notice. Id. §13.2 (ii). At that point, Amtrak could demand that ExpressTrak return all of the refurbished railcars at ExpressTrak's expense, and all of ExpressTrak's previous rights of possession and use of such railcars "absolutely cease[d] and terminate[d] as though [the Sublease] had never been made." Id.

Finally, the Sublease also contained three explicit anti-waiver provisions that governed ExpressTrak's payment obligations and prevented ExpressTrak from subsequently attempting to alter its absolute and unconditional obligation to make

timely payments absent a written amendment signed by both parties.  See id. §§13.3, 13.4, 21.2.  Specifically, Section 13.3 provides that Amtrak's failure "to exercise the rights granted it hereunder upon the occurrence of any of the contingencies set forth herein," such as the right to receive timely rental payments, "shall not constitute a waiver of any such right upon the continuation or recurrence of any such contingencies, or upon the occurrence of any similar contingencies." Id.

"Under the Sublease, rental payments were to be made quarterly in arrears on the first business day of the quarter."  Def.'s Opp'n. Mem. at 24.  Initially, rental payments consisted of two components. Id. First, there was Interim Rent for cars on which there had been a closing during the quarter for which rent was to be paid.[9]  Amtrak Ex. 32 (Sublease)§ 4.1.  Second, there was Base Rent, which amounted to rent for a full quarter of a calendar year, paid for  railcars on which a closure had occurred during quarters immediately prior to the quarter for which rent was to be paid.  Id.  The amount of a rental payment for a railcar could not be determined until the Rent Factor was known. Def.'s Opp'n. Mem. at 25.  And the Rent Factor was a number, expressed as a percentage, which was determined by

---

[9] A closing occurred when railcars were purchased by Orix, as the Headlessor, leased to Amtrak, as lessee, under the Headlease, and subleased by Amtrak, as lessor, to ExpressTrak, as lessee, under the Sublease.  Amtrak Ex. 32 (Sublease) at 3.

Orix. Amtrak Ex. 31 at 2,  (Headlease, Schedule II) at AM0002483.  The formula

for calculation of the Rent Factor was known only to Orix and the Rent Factors

varied each quarter.  Id.; ExpressTrak Ex. 115-116.

**The January 2002 Late Payment**

Prior to January 2002, the quarterly rental payments due from ExpressTrak

under the Sublease had been relatively small because few cars had been put into

service.[10]  However, with a total of 55 cars under the Sublease in service by

December 2001, the payment due in January 2002 ($208, 665.09), was

---

[10] The quarterly rent payments prior to January 2002, that were due from ExpressTrak under the Sublease, were in the amounts of $5,156.25; $25,312.50; and $59,522.40.  ExpressTrak Exs. 115-116 (invoices for accounts # 41334 and 42138); 120 (invoice for Sublease rental payments); 122-125(invoices for railcars covered by Sublease). Orix first invoiced Amtrak on June 21, 2001, for Interim Rent on railcars closed on in the second quarter of 2001.  ExpressTrak Ex. 115.  Thereafter, the date of the invoice being uncertain, Amtrak invoiced ExpressTrak for second quarter 2001 rents.  Def.'s Opp'n. Mem. at 26; ExpressTrak Ex. 120 (invoice for Sublease rental payments). The invoice which was dated July 4, 2001, and had a designated due date of July 9, 2001, was facsimiled to  Sharon Price-Wachowski on August 14, 2001.  Id. ExpressTrak paid the July 4, 2001 invoice with a check dated August 22, 2001.  ExpressTrak Ex. 101(check register), at ET027147.  Rental for the third quarter of 2001 was invoiced by Orix to Amtrak in two installments.  Def.'s Opp'n. Mem. at 26. The first invoice, undated, was for Base Rent of $25,312.50.  ExpressTrak Ex. 122 (invoice).  The second invoice, transmitted by facsimile on September 27, 2001, was for Interim Rent in the amount of $59,522.40. ExpressTrak Ex. 116 (invoice for account # 42138).  Subsequently, Amtrak invoiced ExpressTrak on September 26, 2001, for $25,312.50 and incorrectly titled it Interim Rent.  Def.'s Opp'n. Mem. at 27.  The invoice should have been correctly titled Base Rent.  Id.; ExpressTrak Ex. 122 (invoice for account # 41334).  Nearly a month later, on October 25, 2001, Amtrak invoiced ExpressTrak for the $59,522.40 component of third quarter 2001 Sublease rental payments.  Def.'s Opp'n. Mem. at 27.  The invoice correctly noted that it was for Interim Rent. ExpressTrak Ex. 125 (invoice # EXPRESS/ORIX03).  ExpressTrak paid the September 26, 2001 invoice with a check dated November 28, 2001 and the October 25, 2001 invoice was paid with a check dated January 2, 2002.  ExpressTrak Ex. 101(check register) at ET027147.

significantly greater than previous payment amounts.  Pl.'s Mem. at 15.  In early

December 2001, Amtrak executives had become concern with ExpressTrak's

payment history.  Amtrak Ex. 35 (email from Kathleen Logue to Srinath dated

Dec. 13, 2001).  Specifically, Kim Gilmore, an employee in Raj Srinath's office,

Amtrak's Director of Corporate Finance Group, informed Kathleen Logue,

Director of Finance in Amtrak's Mail & Express Division, that ExpressTrak had

been billed three payments as of December 17, 2001, and all payments had been

late.[11]  Amtrak Ex. 36 (email from Gilmore to Logue dated Dec. 17, 2001).

Relying on a spreadsheet showing ExpressTrak's payment history, she observed

that:

> The first payment was late by about 2 months: the payment was
> due on July 9, 2001 and we received a check on August 31.
> The second payment was due on October 5, 2001; ExpressTrak
> said that they have mailed a check dated November 28, 2001
> but we have no records receiving it.  The third payment was
> due on October 30, 2001 and we have not yet received the
> payment.
>
> From the sublease agreement dated as of May 15, 2001,
> ExpressTrak [is] in default as they are late in payment by more
> than 5 days.

Id.  The next day, Logue notified Jeffrey Levin, Chief Financial Officer of

---

[11] On December 13, 2001, Logue made inquiries to Srinath's office covering
ExpressTrak.

Amtrak's Mail & Express Division, of ExpressTrak's late payment history. Amtrak Ex. 37 (email from Logue to Levin dated Dec. 18, 2001).

On December 19, 2001, Amtrak's Leonardo Reos sent an email to Orix to "check on the [payment] amount that [was] due" on the January 2, 2002. Amtrak Ex. 38 (email from Leonardo Reos to Orix dated Dec. 19, 2001) . On December 21, 2001, Orix facsimiled to Amtrak three separate invoices totaling $208, 665.09, for the fourth quarter rent due on January 1, 2002. Amtrak Ex. 39 (Orix's Quarterly Invoice to Amtrak dated Jan. 2 2002). On that same day, Amtrak facsimiled the $208,665.09 invoice to Carlos Bermudez's attention at Soave and specified a due date of January 2, 2002. Amtrak Ex. 40 (facsimile to Jerred Brown to Carlos Bermudez dated Dec. 21, 2001), 41(Amtrak's Quarterly Invoice to ExpressTrak dated Dec. 21, 2001). ExpressTrak failed to make the $208,665.09 payment by the January's due date.[12] Amtrak Ex. 52 (letter from Stein to Unger dated April 15, 2002).

---

[12] ExpressTrak was aware that the January payment was outstanding, because on February 15, 2002, Soave's accounting department generated a report, which listed the $208,665.09 Amtrak obligation as being over 30 days past due as of January 31, 2002. Amtrak Ex.43 (deposition transcript of Sharon Price-Wachowski taken on May 13, 2005) ("Wachowski Trans.") at 128-129; id. 46 (Soave Aging Report dated Feb. 15, 2002). On March 29, 2002, a new Soave Enterprises report listed the $208,665.09 payment owed to Amtrak as 60 to 90 days past due. Amtrak Ex. 47 (Soave Aging Report dated Mar. 29, 2002); id. 43 ( Wachowski Trans. at 130-135.).

**The April 2002 Late Payment**

For the next large quarterly payment, Orix facsimiled to Amtrak three separate invoices totaling $229,153.91 for first-quarter 2002 interim and quarterly rent, with a due date of April 1, 2002. Amtrak Ex. 48 (Orix's Quarterly Invoice to Amtrak dated April 11, 2002). On March 29, 2002, Amtrak promptly facsimiled a $229,153.91 invoice to the attention of Carlos Bermudez and Sharon Price-Wachowski at Soave Enterprises. Amtrak Ex. 49 (Amtrak's invoice to ExpressTrak dated Mar. 29, 2002). The invoice specified a due date of April 1, 2002. Id. Nevertheless, ExpressTrak failed to pay the $229,153.91 invoice by April 1. Pl.'s Mem. at 19; Amtrak Ex. 59 (ExpressTrak's Statement of the Case in arbitration proceedings) at 23.

**The Notice of Default and Termination**

When ExpressTrak did not satisfy the $229,153.91 payment obligation by April 1, 2002, Amtrak gave ExpressTrak notice that it was terminating the Sublease. Amtrak Ex. 52 (letter from Stein to Unger dated April 15, 2002). Accordingly, on April 15, 2002, Amtrak's Treasurer, Dale Stein, provided written notice to ExpressTrak CEO Unger that ExpressTrak was allegedly in default pursuant to Sections 13.1 and 12.3 of the Sublease. Id. Amtrak specifically cited ExpressTrak's failure "to make the following payments under the Sublease: (1)

17

$208,655.09 due on January 2, 2002; and (2) $229,153.91 due on April 1, 2002."

Id.  By a letter also dated on April 15, 2002, Stein informed Unger that Amtrak

was also exercising its right under Section 13.2(ii) of the Sublease to terminate the

Sublease and to demand return of the 55 cars leased to ExpressTrak under the

Sublease.  Amtrak Ex. 53 (letter from Stein to Unger dated April 15, 2002) at AM

0003457.

Two days later, ExpressTrak and Soave Enterprises attempted to satisfy its

outstanding payment obligation by submitting a payment of  $437,819.00 to

Amtrak.[13]  Amtrak Ex. 54 (ExpressTrak's April 17, 2002 Wire Transfer).  By letter

dated April 22, 2002, Lee Sargrad, Amtrak President of Mail & Express, advised

Unger that Amtrak was applying ExpressTrak's payment to the overdue amounts

referenced in the April 15, 2002 default notice.  Amtrak Ex. 55 (letter from Sargad

to Unger dated April 22, 2002).  Sargrad noted that under the terms of the

Sublease, "ExpressTrak's late payments do not cure the defaults or affect the

Cancellation Notice sent on April 15, 2002."  Id.  Therefore, Amtrak was

unwilling to voluntarily rescind the notice of default or its termination of the

Sublease.  Id.  By letter dated April 25, 2002, ExpressTrak responded to Amtrak's

---

[13] The payment did not include interest at the overdue penalty rate as required by Section 4.2 of the Sublease.  Pl.'s Mem. at 21.

actions by asserting that it was not in default of its lease obligations, that Amtrak's April 15, 2002 notices of default and termination were "ineffective and unenforceable," and that "Amtrak does not have the unilateral right to demand return of the express cars." Amtrak Ex. 56 (letter from Unger to Sargrad dated April 25, 2002).

On May 3, 2002, the parties entered into a "Standstill Agreement" under which Amtrak agreed to take no steps to enforce Amtrak's asserted right to take possession of the cars while the parties attempted to resolve their differences. Amtrak Ex. 56 (letter from Unger to Sargrad dated April 25, 2002); Amtrak Ex. 57 (letter from Sargrad to Unger dated May 1, 2002).  The "Standstill Agreement" remained in effect through September 8, 2002,  Pl.'s Mem. at 22, during which Amtrak continued to operate the railcars that transported ExpressTrak's freight and held in abeyance its decision to take possession or control of the railcars as it indicated it would pursuant to its letter dated April 22, 2002,  Amtrak Ex. 57 (letter from Sargrad to Unger dated May 1, 2002).

## II.  Standard of Review

This Court will grant a motion for summary judgment under Rule 56(c) "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material

fact and that the moving party is entitled to judgment as a matter of law."

Fed.R.Civ.P. 56(c).  When ruling on a summary judgment motion, this Court must

view the evidence in the light most favorable to the nonmoving party.  Bayer v.

Dep't of Treasury, 956 F.2d 330, 333-334 (D.C. Cir.1992); see also Anderson v.

Liberty Lobby, Inc., 477 U.S. 242, 255(1986) (holding that courts must draw "all

justifiable inferences" in the nonmoving party's favor and accept the nonmoving

party's evidence as true).  "[T]he nonmoving party 'must do more than simply

show that there is some metaphysical doubt as to the material facts.'" Bias v.

Advantage Intern., Inc., 905 F.2d 1558, 1561 (D.C. Cir. 1990) (quoting Matsushita

Elec. Indus. Co. v. Zenith Radio, 475 U.S. 574, 586 (1986)).  It must "provide

evidence that would permit a reasonable [fact-finder] to find" in its favor.

Laningham v. U.S. Navy, 813 F.2d 1236, 1242 (D.C. Cir. 1987).  Under Rule 56

(c), "if a party fails to establish the existence of an element essential to that party's

case and on which that party will bear the burden of proof at trial," summary

judgment is warranted.  Hazward v. Runyon, 14 F. Supp. 2d 120, 122 (D.D.C.

1998) (citing Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986)).  In considering

a motion for summary judgment, "the court...may not make credibility

determinations or weigh the evidence." Reeves v. Sanderson Plumbing Prods.,

Inc., 530 U.S. 133, 150 (2000).

### III.  Legal Analysis

The plaintiff seeks summary judgment based upon its position that the defendant breached the terms and conditions of the Sublease by failing to timely pay the required quarterly rent payments due in January 2002 and April 2002, thereby resulting in a default of the Sublease.  Pl.'s Mem. at 23.  Additionally, the plaintiff contends that it is entitled to summary judgment because its acceptance of three delinquent payments from the defendant did not amount to a waiver of its contractual rights to timely payments under the Sublease and did not prevent it from terminating the Sublease on April 15, 2002.  Id.  In response, the defendant contends that the plaintiff, by accepting the three late payments from the defendant, waived (1) Section 4.1(I) of the Sublease regarding rental payment due dates; (2) Section 13.1(I) of the Sublease regarding when a default occurs, and (3) the non-waiver clauses of Sections 13.3, 13.4, and 21.2 of the Sublease, or alternatively, Amtrak is estopped from relying on these anti-waiver provisions. Def.'s Opp'n. Mem. at 33-34. The defendant further asserts that the plaintiff failed to notify the defendant of its intent to strictly comply with the Sublease after the initial late payments were made and accepted, and therefore, the plaintiff's notice of default and its termination of the Sublease "were legally ineffective." Id. at 34.

## A. ExpressTrak's Waiver Theory

It is undisputed that the defendant failed to timely make the two quarterly rental payments, that were due on January 1, 2002, and April 1, 2002, and that the Sublease designated that such conduct amounted to a default.  Amtrak Ex. 59 (ExpessTrak's Statement of the Case in arbitration pleadings) at 23.  However, the defendant asserts that the plaintiff waived its right to declare a default based on the two delinquent quarterly rental payments at issue because it previously ignored due dates set forth in the Sublease and accepted each payment the defendant made prior to April 15, 2002, without objection.  Def.'s Opp.'n Mem. at 33, 35.  While failure to satisfy the contractual obligation to make timely payments generally constitutes a breach of the contract and merits an aggrieved party noting a default, a plaintiff's "course of performance after execution of the contract can operate as a waiver of specific contractual provisions." Exxon Corp. v. Crosby-Miss. Res., Ltd., 40 F.3d 1474, 1490-92 (5th Cir. 1995) (citing T.J.Stevenson & Co. v. 81,193 Bags of Flour, 629 F.2d 338, 365 (5th Cir. 1980)).  The "intent to waive a known right need not be expressly stated but may be inferred from conduct inconsistent with an intent to enforce that right." Nortel Networks, Inc. v. Gold & Apple Transfer, S.A., 298 F. Supp. 2d 81, 88 (D.D.C. 2004) (citation omitted).    Section

28:2A-207 of the District of Columbia Code provides[14] , "[i]f a lease contract involves repeated occasions for performance by either party with knowledge of the nature of the performance and opportunity for objection to it by the other, any course of performance accepted or acquiesced in without objection is relevant to determine the meaning of the lease agreement."  Thus, consistent with the Uniform Commercial Code ("UCC") and District of Columbia law, a party's course of performance can modify the contracted terms of a lease agreement.  Radiation Sys., Inc. v. Amplicon, Inc., 882 F. Supp. 1101, 1103 (D.D.C. 1995).

Section 28:2A-208(b) of the District of Columbia Code provides, "[a] signed lease agreement that excludes modification or rescission except by a signed writing may not be otherwise modified or rescinded, but, except as between merchants, such a requirement on a form supplied by a merchant must be separately signed by the other party."  D.C. CODE ANN. §28:2A-208(b) (2001). The parties subject to this action have drafted in Section 21.2 of the Sublease a

---

[14] The terms of the Sublease are governed by the District of Columbia law.  Amtrak Ex. 32 (Sublease) § 25.  The Sublease is a "finance lease" for purposes of Article 2A of the Uniform Commercial Code ("UCC").  Id.  The District of Columbia has adopted the UCC, including Articles 2, which applies to sales, and 2A, which applies to leases.  See D.C. CODE ANN. §§28:1-101 through 28:2-725 and 28:2A-101 through 28:2A-532 (2001).  Since the provisions of Article 2A are substantively identical to the corresponding Article 2 provisions, case law interpreting Article 2 is persuasive authority when deciding a similar issue with respect to a lease. Official Comment for UCC §2A-101. The applicable statutory provisions are D.C. CODE ANN §28:2A-207, and D.C. CODE ANN. § 28:2A-208.

provision similar to the provision identified by Section 28:2A-208(b) of the

District of Columbia Code, which requires any modification or rescission of a

contract to be in writing.  See D.C. CODE ANN. § 28:2A-208(b).   However, the

District of Columbia Code limits the effect of this provision by providing that

"[a]lthough an attempt at modification or rescission does not satisfy the

requirement of subsection (b) of [§  28:2A-208], it may operate as a waiver."  D.C.

CODE ANN. § 28:2A-208(c).  The District of Columbia Code further provides that

"[s]ubject to the provision of section 28:2A-208 on modification and waiver,

course of performance is relevant to show a waiver or modification of any term

inconsistent with such course of performance." D.C. CODE ANN. § 28:2A-207(c).

Thus, "[t]he combination of §§ [28:2A-207(c) and 28:2A-208(c)] establish[] that

the parties' course of performance after execution of the contract can operate as a

waiver of specific contractual provisions." T.J. Stevenson & Co., 629 F.2d at 365.

Here, the plaintiff contends that the defendant's course of performance defense

is groundless because the three explicit anti-waiver provisions in the Sublease are

binding and enforceable as a matter of law, and therefore preclude the defendant's

defense.  Pl.'s Mem. at 27.  In particular, the plaintiff notes that Section 13.3 of the

Sublease specifically provides that its failure "to exercise the rights granted it

hereunder upon the occurrence of any of the contingencies set forth herein shall

not constitute a waiver of any such right upon the occurrence of any similar

contingencies." Id.; Amtrak Ex. 32 (Sublease) §13.3.  And a plausible reading of

Section 13.3 is that the plaintiff continued to possess the right to terminate the

Sublease pursuant to Section 13.1 even though it failed to exercise that right when

the defendant neglected to make the three earlier payments as required. See GLM

P'ship v. Hartford Cas. Ins. Co., 753 A.2d 995, 998 (D.C. 2000) ("Where the

language is clear and unambiguous, its plain language is relied upon in

determining the parties' intent.  Where the terms of the document leave no room

for doubt, the effect ... can be determined as a matter of law.") (internal citation

omitted). The plaintiff also points out that the Sublease further states that the

defendant "hereby waives any mandatory requirements of law . . . which might

limit or modify the remedies herein provided . . . [and] all statutory or other legal

requirements for any notice of any kind [and] any other requirement with respect

to the enforcement of [plaintiff's] rights under this Lease."  Pl.'s Mem. at 27;

Amtrak Ex. 32 (Sublease) §13.4.  Additionally, the plaintiff relies on Section 21.2

of the Sublease which provides that "[n]o variation or modification of this Lease

and no waiver of any of its provisions or conditions shall be valid unless in writing

and signed by duly authorized signatories."  Id.; Amtrak Ex. 32 (Sublease) §21.2.

On the record before the Court, it cannot find that the plaintiff waived the anti-

waiver provisions of the Sublease when it accepted three late payments from the

defendant for several reasons.

First, the parties are both sophisticated commercial entities that are represented

by counsel and entered into a contract with a sophisticated financing arrangement

that made timely payments an essential component of their relationship.  Pursuant

to the Operating Agreement, the plaintiff as a "pass-through entity,"[15] was

required to make scheduled payments to Orix, the lessor of the railcars, and on the

exact same day the defendant was required to make an identical payment to the

plaintiff under the Sublease.  Amtrak Ex. 20 (Operating Agreement) §§ 1.1, 1.2,

1.8.  Specifically, the defendant was required to make quarterly rent payments to

the plaintiff on the same date, in the same manner, and in the same amount as the

plaintiff was obligated to make.  Amtrak Ex. 32 (Sublease) §§ 1.1, 4.1, 4.3.

Although the Sublease does not explicitly state that "time is of the essence," the

Court's reading of the Sublease leads to the conclusion that in order for the

financing arrangement to operate in the manner intended, both parties were

---

[15] The term "pass through entity" defines the plaintiff 's role in the financing arrangement
established by the parties, whereby the plaintiff's greater financial status was used to secure
financing but the defendant was solely responsible for making the lease payments through the
plaintiff to the financing company.  Therefore, although the plaintiff secured the financing for the
railcars, the actual responsibility for satisfying the lease payment obligation was the defendant's.
Pl.'s Mem. at 6.

obligated to make timely payments.[16]   See, e.g., Schneider v. Dumbarton

Developers, Inc., 767 F.2d 1007, 1016 (D.C. Cir. 1985) (strict compliance with

performance dates may not be waived orally if time is of the essence); Finard &

Co. v. Capitol 801 Corp., 749 F.Supp. 15, 19 (D.D.C. 1990) (granting summary

judgment and stating if "an agreement clearly manifests the importance of time

delivery, . . . the exact words, 'time is of the essence' do not have to appear in the

agreement"), aff'd in part, 976 F.2d 1444 (D.C. Cir. 1992); Seigel v. Banker, 486

A.2d 1163, 1165 (D.C. 1984) (noting that under D.C. law the inclusion of "the

exact phrase 'time is of the essence' is not necessary when 'definite terms of the

contract show the parties regarded time of performance to be of vital

importance'").   Further, the importance of the parties making timely payments is

demonstrated by their decision to specifically exclude failure to make timely rental

payments from the list of curable defaults.  Amtrak Ex. 32 (Sublease) §13.1(iv).

Hence, "[t]he contract speaks for itself and the liabilities of the parties must be

determined by its plain and obvious meaning." Siegal, 486 A.2d at 1166.  When

_____

[16] Pursuant to the pass-through financing arrangement, the parties contemplated that the defendant would cause the refurbished cars to be conveyed to a third-party lessor who would thereafter own and retain title to the cars.  Amtrak Ex. 20, Operating Agreement § 1.8.  The third-party lessor would in turn lease the cars to the plaintiff, and the plaintiff would then sublet the cars to the defendant.  Id.  Under this arrangement, the plaintiff would make the lease payments to the third-party lessor, and the defendant would simultaneously make the equivalent lease payments to the plaintiff.  Id.; Amtrak Ex. 21 (deposition transcript of  Srinath taken on May 15, 2005) at 111-112.

the defendant failed to timely satisfy its payment obligations, the financing arrangement the parties structured was materially altered because the defendant was no longer in compliance with the terms of the Sublease.

Second, the Court finds that the plaintiff's conduct of accepting the three late payments from the defendant was not sufficiently pervasive to abdicate the terms of the anti-waiver provisions of the Sublease.  Since this Court has not found, and the parties have not cited any cases where the District of Columbia Court of Appeals, or the District of Columbia Circuit interpreting District of Columbia law, have found a waiver of an anti-waiver clause with analogous facts, the Court has consulted the law of other jurisdictions.  Several jurisdictions have rejected a course of performance waiver defense and enforced anti-waiver provisions even in situations where the agreement was not a sophisticated time-sensitive financing arrangement similar to the one in this case.  See, e.g., Monarch Coaches, Inc. v. ITT Indus. Credit, 818 F.2d 11, 13 (7th Cir. 1987) (enforcing under Illinois law anti-waiver provision in loan agreement over waiver argument premised on the fact that creditor had previously accepted two late payments); In re Wil-Low Cafeterias, 95 F.2d 306, 309 (2d Cir. 1938) (enforcing under federal bankruptcy law anti-waiver provision in loan agreement over wavier argument premised on the fact that creditor had accepted two late payments); Ring v. Mpath Interactive,

302 F. Supp. 2d 301, 304-305 (S.D.N.Y. 2004) (enforcing under New York law anti-waiver provision in commercial lease at summary judgment stage over waiver argument premised on the fact that sublessor had accepted five late rent payments over five month period); NL Indus., Inc. v. PaineWebber Inc., 720 F.Supp. 293, 302-305 (S.D.N.Y. 1989) (enforcing also under New York law anti-waiver provision in commercial sublease at summary judgment stage over waiver argument premised on the fact that sublessor had accepted no rent in one month and partial payments in six other months despite contractual provision requiring full and timely payments).  Moreover, the period of time during which the plaintiff accepted the defendant's three late payments is comparatively shorter than time periods where other courts have found that a party's conduct waived a contractual payment provision with respect to timeliness.  See, e.g., Westinghouse Credit Corp. v. Shelton, 645 F.2d 869, 870 (10th  Cir. 1981) (summary judgment for assignee of retail installment contract based on anti-waiver provision not proper under Oklahoma law where assignee accepted late monthly payments over three and a half years period); Olga's Kitchen v. Papp, 815 F.2d 79 (Table), 1987 WL 36385, at *4 (6th Cir. Feb. 16, 1987) (acceptance of later payments occurred over five year period); Entrepreneur, Ltd. v. Yasumau, 498 A.2d 1151, 1164 (D.C. 1985) (landlord accepted at least twenty-four monthly payments with knowledge

that tenant was in violation of a lease covenant).

Third, the Court finds that the plaintiff is not estopped from asserting its contractual rights under the Sublease because its acceptance of the three late payments did not amount to a waiver of the anti-waiver provisions of the Sublease. This result is warranted since the defendant has not presented evidence which sufficiently demonstrates that the plaintiff's conduct caused it to justifiably believe that continuous late payments were acceptable. And because the defendant predicates the applicability of both its waiver and estoppel theories on the plaintiff's acceptance of the late lease payments, for the same reasons discussed above as to the waiver question, the Court must conclude that the estoppel defense is not available either. Def.'s Opp'n Mem. at 40-41.

Despite how the Court views the legal landscape, the defendant cites as authority from this jurisdiction Entrepreneur, 498 A.2d at 1161-1162, for the proposition that before the plaintiff could declare a default and seek repossession of the railcars, it was required to give the defendant notice that it intended to strictly comply with the terms of the contract. Def.'s Opp.'n Mem. at 41. Entrepreneur, however, is distinguishable from the present action for several reasons. The lease in Entrepreneur included a clause that waived the tenant's right to receive notice that it must cease activity occurring on the leased premises that

amounted to disorderly or illegal conduct and a provision that precluded the

waiver of a breach of one part of the lease to amount to a waiver of a breach of any

other part of the lease. 498 A.2d at 1155-56.  Even with these two provisions in

the lease, the court in Entrepreneur explained that "where the landlord has long

tolerated his tenant's conduct without protest, and has accepted the benefits

accruing to him under the lease, it would be 'inequitable for [the] landlord to

enforce a forfeiture ... at least without a reasonable warning to [the] tenant to

conform to the terms of the lease....'  Such a landlord will be estopped from

'abandon[ing] his custom and enforc[ing] the terms of the lease literally and

strictly without giving fair notice and warning to the tenant who has come to rely

on the custom.'" 498 A.2d at 1162-63 (citation omitted).  There, the landlord had

accepted at least twenty-four monthly payments with knowledge that the tenant

was in violation of a lease covenant, id. at 1164, whereas, in the present case, the

plaintiff accepted only three comparatively small late payments from the defendant

over the course of approximately two to three months.

   This Court's research has not disclosed, and the parties have not cited, any

cases decided by courts in the District of Columbia where evidence of a party's

course of performance resulted in a blanket waiver of the anti-waiver provisions of

a contract.  However, in Marlowe v. Argentine Naval Comm'n, 808 F.2d 120

(D.C. Cir. 1986), the District of Columbia Circuit opined, in dicta, the possibility that an anti-waiver clause generally prohibiting oral waiver could itself be waived in certain narrow circumstances. Id. at 123-24.  Specifically, the Circuit observed that "[i]f there were a course of performance in [a] case [where a party to a written contract] had performed according to ... oral modifications and [the other party] had accepted that performance over a course to time, [to] then [permit the latter party to] reverse[] its field and [seek] to have all of the [other party's] performances declared in breach of contract ...[because of D.C. Code Ann. §28:2-207(b)'s requirement that express terms of a contract shall prevail over a course of performance,] would seem harsh ..." Id. at 124.  Thus, the Court left open the possibility that "waiver" in such situations was possible under District of Columbia law.  Id.  Ultimately, however, the court did not reach the issue, and dismissed the waiver argument on other grounds. Id.  In any event, the District of Columbia Circuit clearly noted that "[e]ven when a waiver of express language based on course of performance can be found with respect to terms for which oral modification was attempted, . . . the waiver probably should extend only to those specific terms" and not constitute a blanket waiver of the entire clause. Id. at 124 n.2.  Finally, the District of Columbia Circuit, applying District of Columbia law, has found that the enforcement of anti-waiver clauses is consistent with the

District of Columbia's policy of encouraging "negotiations and minor, reasonable accommodations which are the norm in the business world." Schneider, 767 F.2d at 1016. Moreover, if anti-waiver clauses were not enforced, a contracting party would have no choice but to enforce its contractual rights to the fullest extent throughout the life of the contract, even if the party wanted to make an accommodation because failure to do so could otherwise be deemed a "waiver" of the right to ever enforce the terms of the written contract.[17] This would bring about "a decrease in flexibility and an increase in litigation," Schneider, 767 F.2d at 1016, both undesirable consequences which this Court cannot encourage.

## B. ExpressTrak's Oral Modification Theory

The defendant further asserts that its failure to pay rent under the Sublease should be excused because an employee of the plaintiff had allegedly agreed orally to waive the January 2002 payment until an undetermined point in the future. Def.'s Opp'n. Mem. at 29. Specifically, Soave Enterprises employee Carlos

---

[17] Other jurisdictions have also enforced anti-waiver clauses to promote and encourage negotiations between parties. See Monarch Coaches v. ITT Indus. Credit, 818 F.2d 11, 13 (7th Cir. 1987) ("By assuring that a lender will not be penalized for his forbearance, a no waiver clause is, ex ante ..., in the interest of debtors as well as creditors, for it makes the creditor likelier to accept late payments rather than declaring a default."); B.P.G. Autoland Jeep-Eagle, Inc. v. Chrysler Credit Corp., 799 F. Supp. 1250, 1255 (D. Mass. 1992) ("The nonwaiver clause at issue has the effect of assuring that certain conduct, such as forbearance, may not carry legal consequences which might ensue absent a prior agreement.") (quoting S.H.V.C., Inc. v. Roy, 450 A.2d 351, 352 (Conn. 1982)).

Bermudez testified that he and an Amtrak financial analyst (Leo Reos) entered into an oral agreement to defer the January 2002 payment because they were allegedly unable to confirm the amount that was due.[18]  See Amtrak Ex 42 (Bermudez Deposition.) at 151-154, 158-165, 227.  The defendant takes this position despite the inclusion of Section 21.2 in the Sublease, which provides that "no variation or modification of this Lease and no waiver of any of its provisions or conditions shall be valid unless in writing and signed by duly authorized signatories" of the parties.  Amtrak Ex. 32 (Sublease) §21.2.  The defendant's oral modification defense fails for several reasons.

First, the District of Columbia Code explicitly provides that "the express terms of a lease agreement and any course of performance..., must be construed whenever reasonable as consistent with each other; but if that construction is unreasonable, express terms control course of performance...."   D.C. CODE ANN. §28:2A-207(b).   Second, some courts in the District of Columbia have held that such clauses bar any subsequent oral modifications, concluding that "[c]ontracting parties may modify a written agreement by subsequent oral

_____

[18] The plaintiff asserts that since the commencement of its relationship with Amtrak, Amtrak's billing history was untimely or irregular and often the invoices were inaccurate.  Def.'s Opp'n. Mem. at 22-23; ExpressTrak Ex. 103-111.  The parties dispute whether Amtrak was required to send ExpressTrak invoices for its quarterly rental payments.

communications...unless a clause bars such modification." <u>Hildreth Consulting Eng'rs v. Larry E. Knight, Inc.</u>, 801 A.2d 967, 974 (D.C. 2002) (citation omitted); <u>see also</u> <u>Marlowe</u>, 808 F.2d 120, 123 (D.C. Cir. 1986) (same); However, other courts have held otherwise.  <u>Daisley v. Riggs Bank, N.A.</u>, 372 F. Supp. 2d 61, 70 n.4 ("[A] written contract may be modified or rescinded by a subsequent oral agreement, even where the contract contains express language prohibiting oral modifications")(quoting <u>Puma v. Sullivan</u>, 746 A.2d 871, 875 (D.C. 2002)); <u>see also</u> <u>Clark v. Clark</u>, 535 A.2d 872, 876 (D.C. 1987) (same); <u>cf.</u> <u>Martinsville Nylon Employees Council Corp. v. Nat'l Labor Relations Bd.</u>, 969 F.2d 1263, 1268 (D.C. Cir. 1992) (noting the distinction between the common law rule, allowing subsequent oral modification despite anti-waiver clause, and the UCC rules, making "no-oral-modification clauses" binding, but stating "[w]e need not finally choose today between" the options).  Thus, standing alone, it is not clear whether the no oral modification language of Section 21.1 of the Sublease would bar the defendant's reliance on subsequent oral communications as a matter of the District of Columbia law.  However, when read in its entirety, the no oral modification language of Section 21.1 interacts with other language of that section of the Sublease which provides that "except for the other Operative Documents, this Lease exclusively and completely states the rights of Lessor and Lessee with

respect to the leasing of the Units and supersedes all other agreements, oral or

written, with respect thereto."   Amtrak Ex. 32 (Sublease) § 21.2.  Section 21.1 of

the Sublease therefore undermines the plaintiff's oral modification defense

because, as the District of Columbia Circuit explained in <u>Martinsville Nylon</u>

<u>Employees Council</u>:

> Whatever the ultimate merits of the common law rule denying [the]
> effect to the no-oral-modifications clause, by including the entire
> agreement clause the parties here made clear beyond doubt their
> intention not to be bound to any informal arrangement to which they
> might voluntarily adhere during the term of their [collective
> bargaining agreement].  In effect, each told the other: "If you want
> anything else, you'll have to get it in writing," and to this both
> agreed.

<u>Martinsville Nylon Employees Council</u>, 969 F.2d at 1268.  Accordingly, Section

21.1 of the Sublease precludes any modification of the Sublease through oral

modification.

Further, the two lower level employees of Amtrak and ExpressTrak who

allegedly discussed January 2002 payment, did not have the authority to enter into

or agree to oral modifications of the Sublease on behalf of their employers.

Section 21.2 of the Sublease provides that only "duly authorized signatories" have

the authority to effect a modification or waiver of the Sublease.  Amtrak Ex. 32

(Sublease) §21.2. ExpressTrak CEO Frank Unger testified that he alone possessed

36

the authority to bind ExpressTrak to an agreement.  Amtrak Ex. 62 (Unger

Deposition) at 464-465.  And on Amtrak's side of the equation, Leonardo Reos

was a low-level financial analyst who was neither "duly authorized" under the

Sublease nor possessed with the requisite authority to bind the plaintiff to any oral

modification or waiver of the written agreement.  Amtrak Ex. 21 (Srinath

Deposition) at 8, 10-11, 14; Amtrak Ex. 63 (Sargrad Deposition taken on May 17,

2005) at 101-02.  Therefore, neither Reos nor Bermudez possessed the authority to

orally modify the written contracts.  Accordingly, the defendant's oral

modification defense fails as a matter of law.

## IV.  Conclusion

Based on the foregoing analysis, the plaintiff's motion for partial summary

judgment on its claim that the defendant breached the terms and conditions of the

Sublease is **GRANTED**.

**SO ORDERED** this 16th day of October, 2006.[19]

REGGIE B. WALTON
United States District Judge

---

[19] An Order consistent with the Court's ruling was issued by the Court on September 29, 2006.