UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

_____
                                                          )
NATIONAL RAILROAD PASSENGER        )
CORPORATION,                                     )
                                                          )
        Plaintiff,                                       )
                                                          )
              v.                                          ) Civil Action No. 02-1773 (RBW)
                                                          )
EXPRESSTRAK, L.L.C.,                         )
                                                          )
        Defendant.                                    )
_____ )

## <u>**MEMORANDUM OPINION**</u>

        The plaintiff brings this action alleging that the defendant breached certain

lease agreements that covered its acquisition of railroad cars when the defendant

failed to make the required lease and interest payments to the plaintiff for the cars

pursuant to several agreements between the parties.  Second Amended Complaint

("Compl.")  ¶¶ 1; 42-43.  Specifically, the plaintiff alleges in its Second Amended

Complaint a breach of contract claim (Count I) and a restitution/unjust enrichment

claim (Count II).  <u>Id.</u> at ¶¶ 41-49. The plaintiff has now filed a motion for partial

summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure as

to Count I of the Second Amended Complaint alleging that: (1) the Letter

Agreement[1] dated November 30, 2001, and the Agreement For Temperature

Controlled Perishables Express Transportation ("Operating Agreement") dated

October 27, 1999, legally terminated as of April 15, 2002, Plaintiff's

Memorandum of Law in Support of Plaintiff's Motion for Partial Summary

Judgement ("Pl.'s Mem. II") at 1-2, 7; (2) the Sublease of Railroad Equipment

(Amtrak Sublease No. 01-AS) ("Sublease"), the Letter Agreement, and the

Operating Agreement effectively terminated, if not earlier,  as a matter of law at

least by September 25, 2003, when ExpressTrak elected to declare a total breach

of the agreements and sued for damages, id. at 12-14.[2]  The plaintiff also requests

that it be granted summary judgment on Counts II through IV of ExpressTrak's

counterclaims, which include claims for breach of contract based on claims

ExpressTrak has paid to its customers due to alleged service delays or other events

that resulted in damage to its customers' cargo (Count II), recovery of incremental

---

[1] In the pleadings, the parties interchangeably use the terms Letter Agreement and Direct Lease in referring to the same document.  For clarity, the Court will refer to the actual executed agreement dated November 30, 2001, as the Letter Agreement and the anticipated more formal agreement that was never actually finalized as the Direct Lease.

[2] The plaintiff's breach of contract claim (Count I) concerns three related contracts that set forth the terms of the commercial venture between the parties.  The three contracts are the Sublease, the Letter Agreement, and the Operating Agreement.  The Letter Agreement and Operating Agreement are the subject of the instant motion.  However, the plaintiff has filed a separate motion for partial summary judgment ("Pl.'s Mem. I"), which is presently pending resolution by the Court, as to Count I alleging that the defendant breached the terms and conditions of the Sublease dated May 15, 2001.

funds ExpressTrak has paid under protest for railcars covered by the Letter

Agreement (Count III), and conversion (Count IV) Id. at 15-17.[3]  For the reasons

set forth below, the Court denies the plaintiff's motion for partial summary

judgment as to: (1) the Letter Agreement and Operating Agreement; (2) the

defendant's counterclaim for breach of contract as to the customer claims (Count

II); (3) the defendant's counterclaim for the recovery of incremental payments

ExpressTrak has paid under protest for railcars covered by the Letter Agreement

(Count III); and grants the plaintiff's motion as to (4) the defendant's counterclaim

for conversion (Count IV).

## I.  Factual Background

This Court has set forth an extensive discussion of the facts and background of

the dispute between the parties in another opinion being issued

contemporaneously with this opinion, which resolves another motion for partial

summary judgment filed by the plaintiff.  Accordingly, there is no need to repeat

the entire factual background again here.  However, for clarity, the Court will set

forth the material facts and background that are the most pertinent to the plaintiff's

---

[3] Also filed in conjunction with the plaintiff's motion are Plaintiff's Memorandum of Law
in Support of Plaintiff's Motion for Partial Summary, Defendant ExpressTrak L.L.C.'s Statement
of Genuine Issues in Opposition to Plaintiff's Motion for Partial Summary Judgment, Opposition
of Defendant ExpressTrak L.L.C. to Plaintiff's Motion for Partial Summary Judgment ("Def.'s
Opp'n. Mem."), and Plaintiff's Reply Memorandum of Law in Further Support of its Motion for
Partial Summary Judgment ("Pl.'s Reply").

instant motion for partial summary judgment.

On October 27, 1999, the National Railroad Passenger Corporation ("Amtrak") and ExpressTrak, L.L.C. ("ExpressTrak") executed the Operating Agreement which provided for the transportation of perishable goods (e.g. fruits, vegetables, meat, cheese and other food products), on temperature controlled express railcars attached to Amtrak's intercity passenger trains. Amtrak Ex. 20 (Operating Agreement) ExpressTrak Ex. 7 (same). The Operating Agreement required ExpressTrak to acquire the railcars and enter into a contract with a vendor to have the cars refurbished in accordance with Amtrak's specifications. Id. §§ 1.1,1.2. Pursuant to the Operating Agreement, the parties contemplated that ExpressTrak would cause the refurbished cars to be conveyed to a third-party lessor, who would thereafter own and retain title to the cars. Id. § 1.8. The third-party lessor would in turn lease the cars to Amtrak, and Amtrak would then sublease the cars to ExpressTrak. Id. Under this arrangement, Amtrak would make the lease payments to the third-party lessor, and ExpressTrak would contemporaneously make equivalent lease payments to Amtrak. Id.

After the execution of the Operating Agreement, Amtrak issued a bid proposal to over 30 sophisticated institutional investors, including GE Capital, Banc One, Boeing Capital, and Orix USA Corporation ("Orix"), soliciting financing bids for

4

the ExpressTrak project.  Amtrak Ex. 22 (letter from Carol Dillon to R. Frank Unger dated July 10, 2000); 23 (facsimile from Sue Sparks to Raj Srinath dated June 12, 2000); ExpressTrak Ex. 19 (letter from Dillon to Unger dated July 10, 2000).   Amtrak initially selected the bid submitted by Boeing Capital to finance the refurbishing of the entire fleet.  Amtrak Ex. 22 (letter from Dillon to Unger dated July 10, 2000).  When negotiations with Boeing Capital stalled in the fall of 2000, Amtrak secured an alternative commitment from Orix to finance the acquisition of approximately 110 refrigerated railcars at the maximum cost of $13.86 million.  Amtrak Ex. 24 (letter from Dillon to Unger dated Oct. 19, 2000); ExpressTrak Ex. 23 (Proposal for Rebuilt Refer Boxcars dated Sept. 13, 2000). On December 28, 2000, Amtrak provided ExpressTrak with a Guaranty Letter in which Amtrak committed to finance the acquisition of the 110 cars if Orix failed or refused to enter into a lease transaction or to provide funding as provided in its commitment letter to Amtrak. Amtrak Ex. 65 (letter from Arlene Friner to Unger dated Dec. 28, 2000).  Subsequently, Amtrak secured an amended commitment from Boeing Capital to finance the remaining refrigerated railcars (approximately 250 cars) of the full expanded fleet.  Amtrak Ex. 25 (Boeing amended commitment letter dated Mar. 30, 2001); see also ExpressTrak Ex. 29 (letter from Boeing Capital to Sparks regarding original commitment letter dated Nov. 20, 2000).

Consistent with the terms of the Operating Agreement between Amtrak and ExpressTrak, on May 15, 2001, Amtrak entered into a Lease of Railroad Equipment (Amtrak Lease No. 01-A) ("Headlease") with Orix. Pl.'s Mem. I at 10; Pl.'s Mem. II at 3-4; Amtrak Ex. 31(Headlease).  On the same day, Amtrak, as lessor, and ExpressTrak, as lessee, entered into the Sublease for the cars financed by Orix on behalf of Amtrak.  Pl.'s Mem. I at 12; Pl.'s Mem. II at 3-4.  The agreements between Orix and Amtrak and Amtrak and ExpressTrak have identical provisions. Id.  Accordingly, the Sublease requires ExpressTrak to make quarterly rent payments by wire transfer to Amtrak on the same date that Amtrak makes payments to Orix, in the same manner as Amtrak makes payment to Orix, and in the same amount as Amtrak's payments to Orix.  Amtrak Ex. 32 (Sublease) §§ 1.1, 4.1, 4.3.  ExpressTrak's obligation to timely pay rent to Amtrak under the Sublease is similarly "absolute and unconditional."  Id. at § 5.2 (I).  The Sublease also tracked the strict default and termination provision in the Headlease.  Id.

On November 9, 2001, the Amtrak Reform Council[4] issued its finding that

---

[4] The Amtrak Reform Council is an independent bipartisan commission that was charged by Congress with oversight of Amtrak's performance under the Amtrak Reform and Accountability Act of 1997, including evaluating Amtrak's performance and making recommendations to Amtrak for achieving further cost containment and productivity improvements and financial reforms.  Amtrak Reform and Accountability Act of 1997, Pub. L. No. 105-134, §203, 111 Stat. 2570, 2579-81.  The Amtrak Reform Council is also responsible for providing Congress with yearly reports on Amtrak's progress on the resolution of productivity

(continued...)

Amtrak would fail to achieve operational self-sufficiency by December 2, 2002.[5]

ExpressTrak Ex. 40 (letter from Orix to Amtrak dated Nov. 16, 2001).  Relying on

that action, as well as other events, Orix, on November 16, 2001, provided notice

to Amtrak, ExpressTrak, and Ebenezer Railcar Services ("Ebenezer")[6] that it was

suspending its commitment to provide financing for any further cars.  Id.  As a

result, ExpressTrak invoked the guarantee agreement of December 28, 2000, made

by Amtrak.  ExpressTrak Ex. 33 (letter from Friner to  Unger dated December 28,

2000); Amtrak Ex. 65 (same).  Amtrak agreed to honor its commitments to

---

[4](...continued)
issues or the status of those productivity issues and making recommendations for improvements
and for any changes in law it believes to be necessary or appropriate.  Id.  The goal of operational
self-sufficiency on Amtrak's part also was mandated in the same enactment: "Commencing no
later than the fiscal year following the fifth anniversary of [this Act], Amtrak shall operate
without Federal operating grant funds appropriated for its benefit."  Id. § 201, 111 Stat. 2578.

[5] Amtrak was required to meet financial goals as set forth in 49 U.S.C. §24101(d) (2000).
49 U.S.C. §24101(d) provides that:

> To carry out subsection (c)(11) of this section, Amtrak is
> encouraged to make arrangements with the private sector and
> undertake initiatives that are consistent with good business
> judgment and designed to maximize its revenues and minimize
> Government subsidies.  Amtrak shall prepare a financial plan to
> operate within the funding levels authorized by section 24104 of
> this chapter, including budgetary goals for fiscal years 1998
> through 2002.  Commencing no later than the fiscal year following
> the fifth anniversary of the Amtrak Reform and Accountability
> Act of 1997, Amtrak shall operate without Federal operating grant
> funds appropriated for its benefits.

[6] Ebenzer is the manufacturer ExpressTrak secured to refurbish the railcars.

ExpressTrak under the Guaranty Letter and therefore agreed to purchase the

remaining cars directly from the refurbishing vendor itself. <u>See</u> <u>id.</u>;ExpressTrak

Ex. 88 (letter from Unger to Sargrad dated November 21, 2001).

On November 30, 2001, Amtrak and ExpressTrak entered into a Letter

Agreement ("Letter Agreement") for the remaining 55 cars, wherein Amtrak

agreed to lease the cars to ExpressTrak once they were refurbished and Amtrak

acquired them.  Amtrak Ex. 67 (letter from Dale Stein to  Unger dated Nov. 30,

2001). The pertinent terms of the Letter Agreement are the following:

> This Letter Agreement memorializes the
> agreement between Amtrak and ExpressTrak to
> enter into a direct lease [ ] of those certain railcars
> to be delivered by Manufacturer and purchased by
> Amtrak which are not leased under the Sublease.
> Under the [Letter Agreement], Amtrak and
> ExpressTrak shall have substantially the same
> rights and obligations with respect to the railcars
> made subject thereto as each currently holds with
> respect to the railcars subject to the Sublease, with
> such exceptions as ExpressTrak may agree to....

<u>Id.</u> at 1.

> It is the intention of the parties that this Letter
> Agreement constitutes the Direct Lease between
> Amtrak and ExpressTrak pending execution and
> delivery of a more formal document....

<u>Id.</u> at 2.  Between the signing of the November 30, 2001, Letter Agreement and

Amtrak's issuance of its April 15, 2002, notice of default, Amtrak and

ExpressTrak exchanged a number of drafts of the "more formal document"

referenced in the November 30, 2001, Letter Agreement.[7]  Amtrak Ex. 73 (October

30, 2002, Declaration of Lily Song Yu).  However, it is undisputed that the more

formal Direct Lease was never finalized. ExpressTrak Ex. 146 (letter from Unger

to Sargrad dated May 24, 2002); Pl.'s Mem. II. at 10.

On April 15, 2002, after ExpressTrak twice failed to make lease payments to

---

[7] On December 5, 2001, Lily Shang Yu ("Yu"), Counsel for Amtrak, forwarded William McMaster ("McMaster"), counsel for ExpressTrak, a draft of the Sublease, which was labeled as "v2." ExpressTrak Ex. 143 (facsimile from Yu to McMaster dated December 5, 2001).  There was no cross-default clause – a clause designating that a default of one lease would constitute a default of the other lease – included in this draft. Id.  On January 22, 2002, Yu forwarded McMaster a further draft labeled as "v3." ExpressTrak Ex. 94 (email from Yu to McMaster dated January 2, 2002); ExpressTrak Ex. 144 (draft of Direct Lease).  The transmittal message from Yu stated that this second draft "incorporat[ed] some additional comments from Amtrak." ExpressTrak Ex. 94 (facsimile from Yu to McMaster dated January 2, 2002).  Yu went on to elaborate: "Cross–default: We've added Section 13.1(x) which treats an Event of Default under the Sublease an Event of Default under the Direct Lease." Id.  The provision itself read: "The following events shall constitute a Lease Event of Default . . .(x) an 'Event of Default' has occurred under Amtrak Sublease No. 01-AS, and this section 13.1(x shall hereby constitute a duly executed amendment to Amtrak Sublease No. 01-AS." ExpressTrak Ex. 144 (draft of Direct Lease) at AM0183288. The next draft of the Direct Lease, labeled "v4," was transmitted by Yu to Cathy Nelson on March 25, 2005.  ExpressTrak Ex. 145 (facsimile from Yu to McMaster dated March 25, 2002).  As indicated in the transmittal e-mail, this version was intended to reflect the results of discussion between counsel during the prior week. Id.  The cross-default clause in section 13.1 now reads: "an 'Event of Default' has occurred under that certain Sublease of Railroad Equipment (Amtrak Sublease No. 01-AS), dated as of May 15, 2001 between Amtrak as Lessor and expressTrak as Lessee ("Amtrak Sublease No. 01-AS")." Id. at ET014374. However, this version also inserted a new section 13.5 which reads: "Cross Default.  An Event of Default under Amtrak Sublease No. 01AS shall constitute an Event of Default under this Lease." Id. at ET014376.  Later that same week, on March 29, 2002, Yu forwarded yet another draft of the Direct Lease to Raj Srinath, David Graybeal, and Amtrak's counsel.  Amtrak Ex. 74.  Section 13.1(x) of this version read as it had in the March 25, 2002, draft and  Section 13.5 had been deleted. Id.  Yu's transmittal e-mail acknowledged that, even in her opinion, the draft Direct Lease remained a draft, noting that two matters remained open; namely, resolution of a change order issue and ExpressTrak's approval of the Rent Factor. Id.

Amtrak as required by the Sublease, Amtrak's Treasurer, Dale Stein, provided

written notice to ExpressTrak Chief Executive Officer, R. Franklin Unger, that

ExpressTrak was from Amtrak's perspective in default under Sections 13.1 and

12.3 of the Sublease.  Amtrak Ex. 52 (letter from Stein to Unger dated April 15,

2002).  Stein also noted that "in addition, ExpressTrak's default under the

Sublease is a default under Section 13.1(x) of the [Letter Agreement]."  Id.

Amtrak specifically cited ExpressTrak's failure "to make the following payments

under the Sublease: (1) $208,655.09 due on January 2, 2002 and (2) $229,153.91

due on April 1, 2002."  Id.  In another letter also dated April 15, 2002, Stein

informed Unger that Amtrak was also exercising its right under Section 13.2(ii) of

the Sublease to terminate the Sublease and to demand return of the 55 cars leased

to ExpressTrak under the Sublease.  Amtrak Ex. 53 (letter from Stein to Unger

dated April 15, 2002).  The notice also instructed ExpressTrak to return the

additional 36 refrigerated railcars subject to the Letter Agreement.[8]  Id.

Subsequently, on April 22, 2002, Amtrak provided ExpressTrak with written

directions regarding the timing and location for the return of the cars and asked

that ExpressTrak return the cars within 30 days but indicated that it was "willing

---

[8]The last version of the drafts of the never executed formal Direct Lease called for the
first rent payment to be made on  May 1, 2002.  Amtrak Ex. 74 at 5.

to consider a reasonable extension." Amtrak Ex. 55 (letter from Lee Sargrad to Unger dated Apr. 22, 2002).

On May 3, 2002, the parties entered into a "Standstill Agreement" under which Amtrak agreed to take no steps to enforce its right to take possession of the cars while the parties attempted to resolve their differences. Amtrak Ex. 57 (letter from Sargrad to Unger dated May 1, 2002). During this period, Amtrak continued to operate the cars that carried ExpressTrak freight and held in abeyance its decision to take possession or control of the railcars as it had represented in its letter of April 22, 2002. Amtrak Ex. 57 (letter from Sargrad to Unger dated May 1, 2002). The Standstill Agreement remained in effect through September 8, 2002.[9] Compl. ¶31.

Amtrak filed suit against ExpressTrak in this Court on September 9, 2002.

_____

[9] During the standstill period, ExpressTrak's Unger wrote Amtrak's Sargrad regarding the Letter Agreement rentals. ExpressTrak Ex. 146 (letter from Unger to Sargrad dated May 24, 2002). He expressed the view that as part of the parties' discussions concerning their overall business relationship, they should address finalization of a formal Direct Lease. Id. However, pending final resolution of the terms of that document, Unger stated that ExpressTrak would commence payment of Letter Agreement rentals by June 3, 2002, with another payment to follow in July, and for purposes of computing the payment amounts, it would use the last rent factors utilized by Orix. Id. A payment of $127,157.24 (representing interim rents and full quarterly rents) was made on June 3, 2002, for the period of November 30, 2001, through March 31, 2002. ExpressTrak Ex. 147 (Wire Transfer Entry Review). A payment of $189,512.63 (again representing interim rent and full quarterly rent) was made on July 9, 2002, for the period of April 1, 2002, through June 30, 2002. ExpressTrak Ex. 148 (memorandum from Carlos Bermudez to Raj Srinath and Leonardo Reos dated July 10, 2002); ExpressTrak Ex. 149 (letter from Sargrad to Unger dated July 16, 2002, acknowledging receipt of three July 2002 payments from ExpressTrak).

Amtrak Ex. 58 (Complaint for Declaratory Relief and for Damages and Request for Speedy Hearing dated Sept. 9, 2002) ¶ 30.  On September 27, 2002, Amtrak sent a letter to ExpressTrak to notice additional grounds of default under the Letter Agreement.  ExpressTrak Ex. 150 (letter from Stein to Unger dated September 27, 2002).  Stein first referenced his earlier April 15, 2002, letter, "including specifically Section 13.2(x) [sic]," and then went on to assert as an additional ground of default ExpressTrak's failure to pay the full rents owed through July 1, 2002, under the Letter Agreement.  Id.  Specifically, he stated that ExpressTrak owed Amtrak $304,570.65 for the period November 30, 2001, through June 30, 2002, but that ExpressTrak had paid only $189,512.63, leaving a balance of $115,058.02, which was overdue and constituted a default.  Id.  Unger responded on October 2, 2002, and advised Stein that Amtrak had overlooked the payment ExpressTrak made on June 3, 2002, in the amount of $127, 157.24.  ExpressTrak Ex. 151 (letter from Unger to Stein dated October 2, 2002).

On December 5, 2002, this Court issued an injunction which required Amtrak to continue to operate the sublet railcars while the case was pending resolution by an arbitrator.  Nat'l R.R. Passenger Corp., v. ExpressTrak, L.L.C., 233 F. Supp. 2d 39, 40 (D.D.C. 2002).  However, on June 6, 2003, the District of Columbia Circuit reversed this Court's order compelling arbitration, as well as the injunction that

required continued performance by Amtrak. Nat'l R.R. Passenger Corp., v. ExpressTrak, L.L.C., 330 F.3d 523, 525 (D.C. Cir. 2003).

On June 25, 2003, Amtrak invoked its contractual right under the Sublease to discontinue performance and provided ExpressTrak with written notice of its intent to stop operating the 55 sublet railcars.  Amtrak Ex. 68 (letter from Edward Walker to Unger dated June 25, 2003).  After the District of Columbia Circuit's mandate became final in August 2003, Amtrak stopped operating the 55 sublet railcars.  Amtrak Ex. 69 (letter from Unger to Sargrad dated Aug. 5, 2003); Amtrak Ex. 70 (letter from Sargrad to Unger dated Aug. 11, 2003).  ExpressTrak agreed to cooperate both in securing the 55 sublet railcars and participating in the joint inspection of the cars.  Amtrak Ex. 71 (letter from Unger to Sargrad dated Aug. 22, 2003).

On September 16, 2003, Amtrak notified ExpressTrak of its intent to "no longer accept for movement any loads tendered by ExpressTrak on the fifty-five railcars leased pursuant to the [Letter Agreement]." Amtrak Ex. 72 (letter from Walker to  Unger dated Sept. 16, 2003).  ExpressTrak then filed an answer along with counterclaims on September 25, 2003, which, inter alia, alleged that Amtrak had "repudiat[ed]" the Sublease and "anticipatorily repudiat[ed]" the [Letter Agreement].  Amtrak Ex. 78 (Answer and Counterclaim of ExpressTrak, L.L.C.) ¶

81. As a result of "the interlocking nature of the Sublease and the [Letter Agreement] on the one hand and the Operating Agreement on the other," ExpressTrak declared that such repudiations constituted "a total breach and . . . termination of the Operating Agreement." Id. Subsequently, ExpressTrak filed for bankruptcy on October 3, 2003, which had the effect of preventing Amtrak from repossessing the 55 cars covered by the Letter Agreement.[10] Amtrak Ex. 77 (Notice of Bankruptcy Filing by ExpressTrak, L.L.C. filed Oct. 6, 2003).

## II.  Standard of Review

Courts will grant a motion for summary judgment under Rule 56(c) "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c).  When ruling on a summary judgment motion, this Court must view the evidence in the light most favorable to the nonmoving party. Bayer v. U.S. Dep't of Treasury, 956 F.2d 330, 333 (D.C. Cir. 1992); see also Anderson v.

---

[10] The notice includes a copy of ExpressTrak's voluntary petition for relief under Chapter 11 filed in the United States Bankruptcy Court for the Eastern District of Michigan.  Amtrak Ex. 77 (Notice of Bankruptcy Filing by ExpressTrak, L.L.C. filed Oct. 6, 2003), Attach. #1.  The voluntary petition provides that "[t]he filing of the bankruptcy case automatically stays certain collection and other actions against the debtor and the debtor's property. [An] attempt to collect a debt or take other action in violation of the Bankruptcy Code, [may result in the creditor being] penalized." Id.

Liberty Lobby, Inc., 477 U.S. 242, 255 (1986) (holding that courts must draw "all justifiable inferences" in the nonmoving party's favor and accept the nonmoving party's evidence as true).  However, "[t]he nonmoving party 'must do more than simply show that there is some metaphysical doubt as to the material facts.'" Bias v. Advantage Intern., Inc., 905 F.2d 1558, 1561 (D.C. Cir. 1990) (quoting Matsushita Elec. Indus. Co. v. Zenith Radio, 475 U.S. 574, 586 (1986)).  Rather, the non-moving party must provide "evidence that would permit a reasonable [fact-finder] to find" in its favor. Laningham v. U.S. Navy, 813 F.2d 1236, 1242 (D.C. Cir. 1987).  Under Rule 56, "if a party fails to establish the existence of an element essential to that party's case and on which that party will bear the burden of proof at trial," summary judgment is warranted. Hazward v. Runyon, 14 F. Supp. 2d 120, 122 (D.D.C. 1998) (citing Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986)).  Finally, in considering a motion for summary judgment, "the court . . . may not make credibility determinations or weigh the evidence." Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 150 (2000).

### III.  Legal Analysis

### A.  Amtrak's Claims

The plaintiff seeks summary judgment on the motion being addressed in this opinion on the theory that because the Sublease and the Letter Agreement created

a single leasing relationship between Amtrak and ExpressTrak for the 110 car fleet governed by the two leases, and Amtrak enjoyed "substantially the same rights and obligations" under the Letter Agreement as it did under the Sublease, ExpressTrak's failure to make payments under the Sublease also constituted an immediate default under the Letter Agreement that gave Amtrak the right to also terminate that aspect of the parties' contractual relationship. Pl.'s Mem. II at 7. Further, the plaintiff contends that if the Court finds that Amtrak lawfully noticed a default of the Sublease and Letter Agreement, then the Operating Agreement is null and void. Id. at 10-11. The defendant responds that the plaintiff's motion for partial summary judgment, based on its default theories, should be denied because the Sublease did not contain a cross-default clause, which Amtrak relied upon as the basis for declaring a default of the Letter Agreement, and the draft of the Direct Lease was never finalized. Def.'s Opp.'n Mem. at 11-17. This Court finds that the plaintiff's motion for summary judgment must be denied for several reasons.

First, contrary to the plaintiff's contention, the District of Columbia Circuit and this Court have not definitively ruled that the Sublease and Letter Agreement comprise a single contractual agreement and consequently recognized that the defendant's default under the Sublease necessarily constitutes a simultaneous

default under the Letter Agreement.  Admittedly, both Courts have noted that the

parties intended to have substantially the same rights and obligations with respect

to the Letter Agreement cars as each has with respect to the Sublease.  Nat'l R.R.

Passenger Corp., 330 F.3d at 530; Nat'l R.R. Passenger Corp., 233 F. Supp. 2d at

41 n.1. However, the question of whether the Letter Agreement and the Sublease

comprise a single integrated contract was not before and therefore not addressed

by either court.  Although the Circuit Court noted that "section 13.2 (ii) of the

Sublease [] provides for cancellation or termination of the Leases upon

ExpressTrak's default," Nat'l R.R. Passenger Corp., 330 F.3d at 530, the Circuit

did not definitively decide that issue.   In District of Columbia v. Sierra Club, the

District of Columbia Court of Appeals astutely observed:

> The rule of stare decisis is never properly invoked unless
> in the decision put forward as precedent the judicial
> mind has been applied to and passed upon the precise
> question.  Questions which merely lurk in the record,
> neither brought to the attention of the court nor ruled
> upon, are not to be considered as having been so decided
> as to constitute precedents.  A point of law merely
> assumed in an opinion, not discussed, is not
> authoritative.

670 A.2d 354, 360 (D.C. 1996) (quoting Murphy v. McCloud, 650 A.2d 202, 205

(D.C. 1994)).  Thus, here, the issue of whether the Letter Agreement and the

Sublease comprise a single integrated contract remains an open question.

17

Second, as noted above, the Letter Agreement provided that Amtrak and ExpressTrak "shall have substantially the same rights and obligations with respect to the railcars made subject thereto as each currently holds with respect to the railcars subject to the Sublease." Amtrak Ex. 67 (Letter Agreement dated November 30, 2001). However, the parties provide in the Letter Agreement that a more formal Direct Lease would be executed. Id. at 2. Although the parties circulated several drafts of a more formal Direct Lease that contained a cross-default provision, a more formal Direct Lease was never finalized. Therefore, neither the Sublease nor the Letter Agreement that was executed on November 30, 2001, include a cross-default clause. Amtrak Exs. 32; 67. Under District of Columbia law, "whether a number of promises constitute one contract or more than one is primarily a question of intention of the parties." Holiday Homes, Inc. v. Briley, 122 A.2d 229, 232 (D.C. 1956); see also Howard Univ. v. Durham, 408 A.2d 1216, 1219 (D.C. 1979).[11] In ascertaining the intention of the parties, the

---

[11] The terms of the Sublease are governed by the District of Columbia law. Amtrak Ex. 32 (Sublease) § 25. The Letter Agreement actually executed by the parties provides that Amtrak and ExpressTrak "shall have substantially the same rights and obligations with respect to the railcars made subject thereto as each currently holds with respect to the railcars subject to the Sublease." Amtrak Ex. 67 (Letter Agreement dated November 30, 2001). The Operating Agreement, which is central to the instant action, also provides that it is governed by District of Columbia law. Amtrak Ex. 20 (Operating Agreement) § 6.7; ExpressTrak Ex. 7 (same). Further, the parties do not challenge in their pleadings the application of District of Columbia law to both the Sublease and the Letter Agreement. The parties also rely on District of Columbia

(continued...)

District of Columbia Court of Appeals has instructed that factors a court may

consider are "whether the parties assented to all the promises as a single whole,

and . . . whether . . . consideration was given for each part as a separate unit or

whether there was a single consideration covering the various parts." Holiday

Homes, 122 A.2d at 232.

    Here, the subject matter of each agreement is separate and distinct from the

other – 55 cars owned by Orix under the Sublease versus 55 cars owned by

Amtrak under the Letter Agreement.  The two agreements were not simultaneously

executed but rather were drafted and executed at different times.  In addition to

considering these factors, when ascertaining the intention of the parties, it is

significant that the negotiations pertaining to the more formal Direct Lease, which

contemplated possible inclusion of a cross-default clause, were still pending when

the plaintiff contends the defendant defaulted under the Sublease.  Since the

negotiations had not been completed and the final formal Direct Lease had not

been executed, this Court is compelled to conclude that there are genuine issues of

material fact concerning whether there was a meeting of the minds between the

---

[11](...continued)
law as support for the theories advanced in their pleadings.  Pl.'s Mem. II; Def.'s Opp'n. Mem.
Therefore, there appears to be no question that the parties intended for District of Columbia law
to govern the parties' relationship.

parties as to whether they intended, understood, and operated under the belief that the Letter Agreement was integrated into the Sublease to form a single contract, and thus, when ExpressTrak failed to make payments under the Sublease its default also constituted an immediate default under the Letter Agreement. Accordingly, the existence of a genuine issues of material fact preclude the Court from granting the plaintiff's motion for partial summary judgment as to the Letter Agreement. Consequently, the Court must also conclude that the plaintiff's motion for partial summary judgment as to the Operating Agreement must also be denied.

Since there are genuine issues of material fact as to whether the Sublease and Letter Agreement form a single integrated contract, thereby precluding summary judgment for the plaintiff, the question of whether the Letter Agreement and the Operating Agreement terminated on April 15, 2002, remains an unresolved issue that is not subject to summary judgment.  However, this Court will address whether both the Letter Agreement and Operating Agreement terminated, at the minimum, on September 25, 2003, when the defendant declared a total breach and sued for damages.[12]

---

[12] The Court's analysis of this question is based on the hypothetical assumption that the fact-finder will determine at trial that the Letter Agreement and Sublease do not form a single integrated contract, thereby resulting in the conclusion that the parties' contractual relationship did not terminate completely on April 15, 2002.  And it should be noted that whether the parties' contractual arrangement terminated on September 25, 2003, becomes a moot issue if it is

(continued...)

The plaintiff argues that the Operating Agreement and the Letter Agreement terminated on September 25, 2003, at the latest, as a consequence of the filing of a counterclaim in this action seeking damages.  According to the plaintiff, the defendant's filing of the counterclaim resulted in the termination of the parties' contractual relationship.  Pl.'s Mem. II at 12-14.  The plaintiff posits that this result is called for because

> [u]nder well-established law, once ExpressTrak chose to treat [Amtrak's] alleged repudiation or anticipatory repudiation of [their] contract as a total breach of the contract, the parties contractual relationship terminated as a matter of law .... ExpressTrak has elected its remedy and therefore cannot now deny that the Sublease, the [Letter Agreement], and the Operating Agreement terminated--at the very least--as of the date of that election.

Id. at 13-14 (citations and footnote omitted).  In response, the defendant contends that it is not seeking double redress for a single wrong by requesting damages in its counterclaim and then filing for bankruptcy, which as noted above, resulted in the plaintiff being required to continue to perform its contractual obligations.  Def.'s Mem. at 21.  The defendant further asserts that the continued operation of

---

[12](...continued)
determined at trial that the Letter Agreement and Sublease form a single integrated contract that was terminated on April 15, 2002.  Therefore, the more relevant question the Court will address at this time is whether the parties contractual relationship terminated prior to ExpressTrak's bankruptcy filing on October 3, 2003.

the rail service brought about by the parties' contractual relationship has mitigated the damages the defendant would otherwise be entitled to receive.  Def.'s Mem. at 20.  The defendant contends that the election of remedies doctrine may not be invoked unless the party asserting the doctrine has materially changed its position as a consequence of the opposing party's prior conduct.  Id. at 21.

It is undisputed that the plaintiff notified the defendant of its intent to "no longer accept for movement any loads tendered by ExpressTrak on the fifty-five railcars leased pursuant to the [Letter Agreement]."[13] Amtrak Ex. 72 (letter from Walker to Unger dated Sept. 16, 2003).  The District of Columbia Circuit has held that if a performing party unequivocally signifies its intent to breach a contract, the other party may seek damages immediately under the doctrine of anticipatory repudiation.  Sys. Council EM-3 v. AT&T Corp., 159 F.3d 1376, 1383 (D.C. Cir. 1998)(citation omitted).  Here, prior to voluntarily filing for bankruptcy, which

---

[13] By letter dated June 25, 2003, the plaintiff notified the defendant of its intention to cease accepting cargo tendered by the defendant on the fifty-five cars leased pursuant to the Sublease once the District of Columbia Circuit's mandate was issued.  Amtrak Ex. 68 (letter from Edward Walker to Unger dated June 25, 2003).  The mandate issued on or about August 12, 2003, and the plaintiff stopped accepting cargo for transport on the sublet cars as of 12:01 a.m. on August 13, 2003, with some exceptions specifically requested by the defendant.  Amtrak Exs. 70 (letter from Lee Sargrad to Unger dated August 11, 2003); 72 (letter from Walker to Unger dated September 16, 2003).  Therefore, the letter from the plaintiff to the defendant dated September 16, 2003, pertained primarily to the anticipated repossession of the cars covered by the Letter Agreement because the plaintiff had already ceased accepting cargo that would be tendered by the defendant for transport on the railcars covered by the Sublease.

resulted in the plaintiff being required to continue operating the 55 direct leased cars, the plaintiff filed a counterclaim on September 25, 2003, alleging that the plaintiff had "repudiat[ed]" the Sublease and "anticipatorily repudiat[ed] the Letter Agreement.  Amtrak Ex. 78 (Answer and Counterclaim of ExpressTrak, L.L.C.) ¶ 81.  Given the purported "interlocking nature of the Sublease and [the Letter Agreement] on the one hand and the Operating Agreement on the other," the defendant declared that the repudiation constituted "a total breach and ...termination of the Operating Agreement."  Id.

When a non-repudiating party is confronted with an anticipatory repudiation, it has "two mutually exclusive options."  Lucente v. IBM Corp., 310 F.3d 243, 258 (2d Cir. 2002).  The non-repudiating party may "(a) elect to treat the repudiation as an anticipatory breach and seek damages for breach of contract, thereby terminating the contractual relation between the parties, or (b) [it] may continue to treat the contract as valid and await the designated time for performance before bringing suit."  Id.; see also Washington Metro. Area Transit Auth. v. Quik Serve Foods, Inc., No. 04-838, 2006 WL 1147933, at *8 (D.D.C. April 28, 2006); First Nat'l Mortgage Co. v. Fed. Realty Inv. Trust, No. C-03-02013, 2005 WL 2206698, at *4 (N.D. Cal. Sept. 12, 2005); Kinesoft Dev. Corp. v. Softbank Holdings, Inc., 139 F. Supp. 2d 869, 897 (N.D. Ill. 2001); Rupe v. Triton Oil & Gas Corp., 806 F.

Supp.1495, 1499 (D. Kan. 1992). In other words, the non-repudiating party

"cannot at the same time treat the contract as broken and subsisting," as "[o]ne

course of action excludes the other." <u>Lucente</u>, 310 F.3d at 258 (quoting <u>Inter-</u>

<u>Power of N.Y., Inc. v. Niagara Mohawk Power Corp.</u>, 686 N.Y.S.2d 911, 913

(App. Div. 1999).  This is clearly the position taken by other jurisdictions.  <u>See</u>

<u>also</u> <u>Horwitz-Matthews, Inc. v. City of Chicago</u>, 78 F.3d 1248, 1251 (7th Cir.

1996) (construing Illinois law the court noted that "[w]hen a contract is

terminated, even wrongfully, there is no longer a contract ....[there is] no duty to

perform and no right to demand performance, unless specific performance is

sought, which it is not here; there is only a right to seek and a duty to pay damages

caused by the termination."); <u>Miller Yacht Sales, Inc. v. Scott</u>, 311 So.2d 762, 763

(Fla. Dist. Ct. App. 1975) (recovery of damages precludes a party "from obtaining

specific performance (or other relief) because of the rule that 'the injured party

should not be allowed to enforce and receive specific performance and at the same

time get judgment for damages for a total breach.'") (internal citation omitted);

<u>Levy v. Mass. Accident Co.</u>, 2 A.2d 341 (N.J. Ch. 1938) (action for breach of

contract constitutes plaintiff's election to treat an anticipatory repudiation as

termination of the contract, thus barring subsequent action by plaintiff for specific

performance) <u>aff'd</u>, 11 A.2d 79 (N.J. 1940).

The defendant argues that because of the "unique circumstances" of this case, there is no inconsistency between its claim of a total breach and the plaintiff being required to continue to perform under the contract in order to mitigate the plaintiff's damages. Def.'s Mem. at 21. The cases the defendant relies on do not support this proposition. In <u>Dean v. Garland</u>, 779 A.2d 911, 915-16 (D.C. 2001), the District of Columbia Court of Appeals refused to allow the plaintiff to sue for both damages for breach of contract and rescission of a sales agreement because the two remedies were deemed inconsistent. The Court of Appeals observed that "inherent in the remedy of recision is the return of the parties to their pre-contract position. Rescission is an equitable remedy, and a party seeking rescission must restore the other party to that party's position at the time the contract was made." <u>Id.</u> at 915. The Court also noted that "if the [] party treats the property as his own and affirms the contract through continued performance, that party is precluded from seeking rescission." <u>Id.</u> Thus, rescission in <u>Dean</u> was precluded because the "[appellants] were aware that at least three agreed-upon repairs had not been completed before settlement, but they nevertheless proceeded with the settlement and accepted the property with these problems, in exchange for payment [for the needed repairs] from appellees . . . ." <u>Id.</u> at 916. In the present action, there is an inconsistency in the remedies selected by the defendant because, on the one hand,

it first elected to treat Amtrak's pronouncement that it would no longer transport

the defendant's railcars as an anticipatory breach and immediately sued for

damages, thereby terminating the parties contractual relationship, <u>Laposta</u>

<u>Oldsmobile, Inc. v. General Motors Corp.</u>, 426 F.Supp.2d 346, 353 (N.D. W. Va.

2006), rather than awaiting the designated time for performance before bringing

suit.  Further, when the defendant filed its counterclaim, it did not request

injunctive relief or specific performance, but instead, specifically requested

damages.  Amtrak Ex. 78 (Answer and Counterclaim of ExpressTrak, L.L.C.) at

31.  Shortly after filing its counterclaim, the defendant filed it voluntary petition

for bankruptcy, which had the effect of requiring the plaintiff to continue to

operate the railcars.  Amtrak Ex. 77 (Notice of Bankruptcy Filing by ExpressTrak,

L.L.C. filed Oct. 6, 2003).  Regardless of the remedy a party selects, it cannot

select different remedies if they are inconsistent.  Here, inconsistency exists due to

the defendant's decision to immediately counterclaim for damages and then file

for bankruptcy, because doing so required the plaintiff to continue to perform as

required by the parties' agreements after the defendant declared the parties'

contractual relationship terminated when it sued for damages.

The defendant's reliance on <u>Northern Helex Co. v. United States</u>, 455 F.2d

546 (Ct. Cl. 1972) and <u>Northern American Graphite Corp. v. Allan</u>, 184 F.2d 387,

389 (D.C. Cir. 1950) is misplaced.  In <u>North American Graphite</u>, the appellant,

North American Graphite Corporation, appealed a judgment entered in this Court

upon a jury verdict in favor of the appellee, Allan, in the amount of $4,000 for

engineering services.  186 F.2d at 388.  The appellant, the defendant before this

Court, had contracted with the appellee for engineering and supervisory services

in its efforts to rehabilitate a graphite mine in Pennsylvania owned by the

appellant.  <u>Id.</u>  After the appellee had performed all or substantially all of the work

called for by the contract, his services were terminated by the appellant in

violation of the contract.  <u>Id.</u>  The appellee sued the appellant on the contract for

its breach and also treated the breach as a repudiation of the contract and sued for

the value of the service he had provided to the appellant.  <u>Id.</u> at 388-89.  On

appeal, the appellant challenged the trial court's decision to permit both theories

of liability to be submitted to the jury.  <u>Id.</u> at 389. The Circuit Court noted that

"the doctrine of election of remedies [ ] seeks to prevent a party from shifting his

position inconsistently [and because] it is rooted in estoppel, the doctrine is not

available as a defense unless the defendant has materially changed his position as

a consequence of plaintiff's previous conduct." <u>Id.</u> at 389.  The Circuit Court also

concluded that "no election is required between contract and quasi-contract [and

that] the two remedies may be joined and pursued in the same action."  <u>Id.</u>

(citations omitted.).   The Circuit Court reasoned that no election was required in

<u>Northern American Graphite</u> because "the absence of any change in appellant's

position or prejudice to it prevents application in any event of the rule requiring an

election." <u>Id.</u>  In <u>Northern Helex</u>, the plaintiff sued for damages for breach of

contract yet continued to provide helium to the defendant, a governmental entity,

because there was no other market for the gas and it was produced as a by-product

of other marketable products produced by the plaintiff.  455 F.2d at 551.  The

issue presented to the court in <u>Northern Helex</u> was whether the plaintiff had

waived its right to assert a total breach in light of its continued performance and

its treatment of the alleged breach as immaterial, not whether the plaintiff could

sue for damages based on a total breach and also force the defendant to continue

performance as required by the contract.  <u>Id.</u> at 552.  Further, there were social

policy concerns at play in <u>Northern Helex</u>, including environmental consequences,

and not just the mitigation of damages that caused the court to vindicate the

plaintiff's decision to continue performance.  <u>Id.</u> at 551.  Accordingly, the

<u>Northern Helex</u> court found that the plaintiff had not waived its right to sue for

damages.  <u>Id.</u> at 551-556.  For the reasons outlined above, it is this Court's

conclusion that the cases relied on by the defendant do not support its proposition

that the "unique circumstances" of this case permit it to sue for damages for a

claim of total breach of the contract and to also require the plaintiff to continue to perform under the contract by voluntarily filing for bankruptcy.

In conclusion, the Court finds, on the record in this case, that even if the fact-finder determines at trial that the Letter Agreement and Operating Agreement did not terminate on April 15, 2002, both agreements were effectively terminated as a matter of law at the latest on September 25, 2003, when ExpressTrak declared a total breach and cross-sued for damages.  Accordingly, the parties contractual relationship terminated prior to ExpressTrak's bankruptcy filing on October 3, 2003.

## B.  ExpressTrak's Counterclaims

The plaintiff also seeks partial summary judgment as to Counts II through IV of the defendant's counterclaim on the grounds that (1) there was no conversion of the railcars covered by the Letter Agreement because ExpressTrak has continued to operate the 55 Letter Agreement cars at all times, Pl.'s Mem. II. at 15; (2) ExpressTrak's default under the Sublease gave Amtrak the legal right to stop operating the railcars covered by the Letter Agreement and because, even if that were not the case, a conversion claim cannot be based on an intangible leasing right, id. at 17; (3) ExpressTrak was required to make the incremental payments for the administrative costs associated with the leasing of the cars pursuant to the

Operating Agreement, id. at 18-20; and (4) ExpressTrak's attempt to collect

reimbursements for certain claims of its customer is infirm because ExpressTrak

has never provided Amtrak with the documentation needed to determine whether

such claims are Amtrak's responsibility pursuant to the terms of the parties'

contract, id. at 20-22;Pl.'s Reply Mem. at 2.[14]  Each of these arguments will be

addressed below in turn.

## 1.  The Breach of Contract Counterclaim (Count II)

The defendant asserts a breach of contract counterclaim premised on the

plaintiff's alleged failure to reimburse it for $60,000 it had to pay its customers for

damages sustained by the customers as a result of Amtrak's alleged service delays

or other events that damaged the customer's cargo while they were in Amtrak's

possession.  Amtrak Ex. 78 (Answer and Counterclaim of ExpressTrak, L.L.C.) ¶¶

83-87; ExpressTrak Ex. 7 at 21. The plaintiff contends that it rejected the

defendant's claims for reimbursement because they were untimely and too vague

based on the documentation submitted by the defendant.  Pl.'s Reply Mem. 10-11.

Section 5.1 of the Operating Agreement specifies that "Amtrak will be

responsible for payment of the cost of individual customer claims that exceed

---

[14] It should be noted that the plaintiff does not seek summary judgment on the defendant's breach of contract claim (Count I) relating to the Operating Agreement, Sublease, and Letter Agreement.  Pl.'s Mem. at 2.

$100 per occurrence that are caused by delay in Amtrak railroad operations of more than 12 hours or by other events that are demonstrated to have occurred while the shipments were in Amtrak's possession." ExpressTrak Ex. 7 at 21; Amtrak Ex. 20 (same).   This same Section also provides that "ExpressTrak will be responsible for payment of all other customer claims [and that] ExpressTrak will process all customer claims...." Id.

The defendant has presented evidence of several of its customers' claims that were forwarded to Amtrak representatives, Sargrad and John Lightner, with correspondence and invoices that included detailed information relating to the claims, such as the railcar number, train numbers, pertinent dates, origination and destination terminals and other relevant information.  ExpressTrak Exs. 162-165. The plaintiff challenges the documentation submitted by the defendant on the grounds that it did not substantiate that the customers' claims resulted from delay caused by the plaintiff and were not brought about by failures within the defendant's operational areas of responsibility.  Pl.'s Mem. II at 20-23.  Further, the plaintiff contends that it did not receive all of the invoices and documentation the defendant alleges was forwarded to it.  Id.

On this record, the Court must deny the plaintiff's demand for summary judgment on this counter-claim because there are genuine issues of material fact as

to which party is responsible for the customer claims for which the defendant is seeking reimbursement.

## 2. The Incremental Payments for Letter Agreement Railcars Counterclaim (Count III)

Pursuant to Section 1.8 of the Operating Agreement, the defendant was obligated to pay the plaintiff a monthly fee of one-tenth of one percent of the purchase price of the railcars, Amtrak Ex. 20 at 7; ExpressTrak Ex. 7 (same), later revised in the Sublease as a quarterly fee of three-tenths of one percent of the purchase price of the cars.  Amtrak Ex. 32 (Sublease) at 4 (Incremental Amount provision).  The defendant asserts that this incremental payment obligation was predicated on Amtrak securing third-party financing for the full expanded fleet of 358 cars.[15]   Def.'s Opp.'n. Mem. II at 26. Therefore, opines the defendant, when Orix no longer provided financing and the remaining railcars were purchased directly by the plaintiff, the incremental amount payment had no application to the 55 railcars covered by the Letter Agreement.  Id.  Thus, the defendant contends

---

[15] The defendant contends that the rationale for the Incremental Amount fee no longer existed with respect to the Letter Agreement cars, because Amtrak no longer incurred costs for which the fee was intended to cover (for example, commitment fees and legal costs related to a headlease) in connection with its dealings with a "headlessor."  Def.'s Opp'n. Mem. at 26. Therefore, ExpressTrak asserts that Count III of its Counterclaim seeks recovery of Incremental Amount payments made to Amtrak for the Letter Agreement cars,  not the recovery of Incremental Amount payments made to the plaintiff for sublet cars.  Id.

that it is entitled to the return of incremental payments of $108,928.29 it made to the plaintiff under protest. Id.  On the other hand, the plaintiff alleges that the defendant was required make incremental amount payments to compensate the plaintiff for the administrative costs associated with the leasing of the cars.  Pl's. Mem. II at 18.  The plaintiff posits that such payments are required under Section 1.8 because the provision clearly and unambiguously required the defendant to make incremental amount payments for all the railcars regardless of whether they were financed directly by the plaintiff or by a third party. Pl.'s Mem. II at 18-19; Pl.'s Reply Mem. II at 9.

Again, the record as to this counterclaim requires the Court to find that there are genuine issues of material fact concerning whether the parties intended for payment of the incremental amount fee to not only apply to the Sublease but also to the 55 railcars purchased by the plaintiff pursuant to the Letter Agreement. Accordingly, the plaintiff's motion for summary judgment as to the defendant's counterclaim for the recovery of incremental amounts paid to the plaintiff for the Letter Agreement cars must be denied.

## 3.  **The Conversion Counterclaim (Count IV)**

The defendant asserts that the plaintiff's decision to deprive it of its contractual right to use the 55 cars covered by the Sublease and the plaintiff's

mere act of "announc[ing]" its intent to do likewise with respect to the 55 cars

covered by the Letter Agreement amounted to a conversion of the railcars, thereby

entitling the defendant to the recovery of punitive damages.  Amtrak Ex. 78

(Answer and Counterclaim-Count IV).  In response, the plaintiff argues that it did

not deprive the defendant of its property rights to use the 55 cars covered by the

Letter Agreement because the plaintiff never stopped operating these cars.  Pl.'s

Mem. II at 15.  In any event, the plaintiff asserts that it was lawfully entitled to

stop operating these cars pursuant to Sections 13 and 14 of the Sublease due to the

defendant's default on its absolute and unconditional payment obligations under

the pass-through financing arrangement.  Id. at 16.

Under District of Columbia law, a party is liable for conversion if the movant

establishes that the other party participated in "(1) an unlawful exercise, (2) of

ownership, dominion, or control, (3) over the personal property of another, (4) in

denial or repudiation of that person's rights thereto."  Poullard v. SmithKline

Beecham Corp., No. Civ. A. 02-1590, 2005 WL 3244192, at *12 (D.D.C. Nov. 30,

2005)(citing Flocco v. State Farm Mut. Auto. Ins. Co., 752 A.2d 147, 158 (D.C.

2000))(other citation omitted).  Based on the record before this Court, it finds that

the defendant's conversion counterclaim as to the 55 railcars covered by the Letter

Agreement fails because the defendant has not satisfied the prima facie

34

requirements for establishing a claim for conversion.  <u>See id.</u>  It is undisputed that

without interruption, the defendant has utilized, throughout this litigation, and

without interruption,  the 55 railcars covered by the Letter Agreement. Pl.'s Mem.

II 15-16; Def.'s Mem. at 20.  Thus, because there is no evidence that the defendant

was dispossessed of its right to use the 55 cars covered by the Letter Agreement,

the defendant's claim of conversion is without merit.  <u>Kaempe v. Myers</u>, 367 F.3d

958, 964 (D.C. Cir. 2004) ("Where there has been no dispossession of property

rights, there can be no action for conversion"); <u>see also</u> <u>Flocco</u>, 752 A.2d at 158

("Without unlawful ownership, dominion, or control, there can be no conversion .

. . .").

In a ruling issued by this Court in another opinion being issued

contemporaneously with this opinion, the Court ruled that the plaintiff was entitled

to partial summary judgment on Count I of the complaint, which alleges that the

defendant had defaulted on its unconditional payment obligations under the

Sublease.  Thus, the defendant cannot satisfy the first element of a prima facie

case of its conversion claim– that the plaintiff's exercise of control over the

railcars covered by the Letter Agreement was unlawful.  Accordingly, even if the

defendant had established that the plaintiff dispossessed the defendant of these

railcars, the plaintiff's motion for partial summary judgment as to the defendant's

35

counterclaim for conversion would nonetheless have to be granted.[16]

## IV.  Conclusion

For the foregoing reasons, the plaintiff's motion for partial summary judgment as to:  (1) Count I of its Second Amended Complaint concerning the Letter Agreement and Operating Agreement is **DENIED**; (2) the defendant's counterclaim (Count II)  for breach of contract is **DENIED**; (3) the defendant's counterclaim (Count III) for the recovery of incremental amounts paid to the plaintiff for the Letter Agreement cars is **DENIED**; and (4) the defendant's counterclaim (Count IV) for conversion is **GRANTED**.

**SO ORDERED** this 16th day of October, 2006.[17]

/s/_____
                REGGIE B. WALTON
                United States District Judge

---

[16] The defendant claim for punitive damages is entirely premised on its conversion claim. Amtrak Ex. 78 (Answer and Counterclaim) ¶ 96.  Specifically the defendant asserts that the plaintiff's "wrongful repossession of the Express Cars was undertaken in bad faith, in willful, reckless and wanton disregard of ExpressTrak's rights under the Operating Agreement, Sublease, and Letter Agreement, and with the malicious intent to destroy ExpressTrak's business, thereby entitling ExpressTrak to seek punitive damages." Id.  Since this Court has determined that the plaintiff is entitled to summary judgment on the defendant's conversion claim, the defendant's punitive damages claim also fails.

[17] An Order consistent with the Court's ruling was issued by the Court on September 29, 2006.